### R. J. KOEPPE & CO. et al. v. SECURITIES AND EXCHANGE COMMISSION.
#### No. 6282.

Circuit Court of Appeals, Seventh Circuit.
Feb. 4, 1938.

Edward J. Fleming, of Chicago, Ill., for appellants.

Allen E. Throop, Gen. Counsel, and Thomas J. Lynch, Asst. Gen. Counsel, both of Washington, D. C., Henry Fitts, of Chicago, Ill., and Francis Thornton Greene, of Washington, D. C. (Sam Harris, of counsel), for appellee.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

The sole controversy between the parties is one of fact. Did the defendants violate sections of the Securities Exchange Act of 1933 and 1934? The sections involved are set forth in the margin.[1]

Inasmuch as there is no question but that the findings and the conclusions of the District Judge support the decree, the precise question is over the evidentiary support of the said findings and conclusions.

Our study of the evidence leaves us with no doubt as to the facts. They are too clear for justifiable disputation.

The plaintiff complains of the defendants' action in the sale of stock in two companies, one the Paducah Cooperage Company, Inc., which will be referred to as the Paducah Co., and the other, the Wahl Co. The stock of the Paducah Co. was registered on the Chicago Curb Exchange and that of the Wahl Company was registered on the Chicago Stock Exchange. Both stock exchanges were registered under the Securities Act.

We will discuss merely the Paducah stock transactions, in which defendants dealt heavily.

By December, '34, the Paducah Co. was financially embarrassed and laboring hard to keep afloat. It had that year lost nearly one-quarter of a million dollars. Its asserted net worth had shrunk to $30,000; its capital stock consisted of 250,000 shares. The book value of a share was 13½¢. Its actual value in the face of the year's record was probably considerably less than its asserted book value. There were threats of criminal prosecution arising out of the mismanagement of the company's affairs and a change of officerial management occurred in January, 1935. A profit for the next six months of approximately $6,000 was asserted.

If the plaintiff's theory be accepted, and there is evidence to support its charge, it

---

[1] Section 9 (a) (1) (2) (3), 15 U.S.C. A. § 78i (a) (1–3).

"(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

"(1) For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security, (A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, or (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

"(3) If a dealer or broker, or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security registered on a national securities exchange by the circulation or dissemination in the ordinary course of business of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any one or more persons conducted for the purpose of raising or depressing the prices of such security."

Section 17 (a) (2), 15 U.S.C.A. § 77q (a) (2). "It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly— * * * (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, * * *"

was at this stage that defendants sought to "rig the market" (by rigging is meant raising the market price of the stock by artificial means) and to unload its large holdings upon the public. On Koeppe Company's own admission, it, at the time, owned 17,000 shares of such stock and shortly afterward acquired 8,000 more. There is evidence to the effect that its total holdings largely exceeded this amount. The last 8,000 shares were acquired about this time at 25⅛¢ per share. In August, 1935, the company made an oral contract with B. E. Buckman Company, a financial house operating in Wisconsin and located at Madison, to sell 45,000 shares of this stock at 65¢ per share.

Beginning in August, 1935 and continuing for about three months, some 46,750 shares were traded in on the Chicago Curb Exchange. Over two-thirds of them were made by the defendant company through twelve different stock exchange houses or members of the New York Exchange. Most of this buying was in the name of Joseph Magner, nominee of Koeppe, and cleared through Sadler Company, then members of the Chicago Curb Exchange. Koeppe had been expelled from the Exchange for fraudulent conduct in 1929.

During this three months' period the price was raised some 200%. There were many days when Koeppe & Company made the closing trade for the day. The stock reached a high of 93¢ per share. Defendants stopped buying on or about October 24 and the price abruptly dropped to 30¢ a share and later reached a level of 3¢, which was its price at the time of the trial. The price at which defendants closed the day's transaction was usually a little higher than the preceding day. Defendants employed salesmen to sell the stock, other than through the stock exchange. Over-the-counter sales they were called, or private sales. A reported sale, which the defendants claim was an accident but which the plaintiff disputes, occurred on October 5. There were only fifty shares sold that day. The price was 73¢ a share. Defendants sold the 50 shares through one brokerage house and purchased the same through another brokerage house. The selling price was three cents higher than the closing price of the day before.

Defendants in manipulating the price, employed one Geldermann to "tout" the stock (Wahl stock) to his friends, paying him $20 for every one hundred shares bought on the exchange market as a result of his recommendations.

It seems Geldermann, who was by himself termed an independent dealer, bought a few shares and then as a holder, he would call up his friends and advise them to purchase this stock. He did not mention Koeppe or the arrangement he had for a commission. If his friends bought, defendant Koeppe paid him a commission. Geldermann testified to the existence of the arrangement and to the receipt of commissions. He was clear on the facts, but had a somewhat confused understanding of the difference between betraying and protecting a friend.

Three different witnesses testified that Koeppe told them that his purpose was to "put the market up," to "get the market up to a dollar or higher," and that he had cleared up by purchase "all the old cheap stock" and that another brokerage concern had been contacted which would help distribute the Paducah stock at not less than a dollar a share. There was also, some direct testimony to the effect that Koeppe said the stock "ought to reflect a price of a dollar and a half or two dollars per share" and that he had no "question about being able to put it there."

Koeppe testified that he did not intend to violate the Securities Act, but was merely filling orders for customers. His profession of innocence conflicted with his selling stock at times for no more or a little less than the closing price on the Chicago Curb the day before. It is hardly believable that he would hire a force of sales agents to drum up business for the sale of this stock when the price realized by him was less than the price he would have to pay on the Exchange for the same stock. (There was at least a commission charge for filling the orders.) The fact that defendant rid himself of 25,000 shares of stock which he held at the time he started the campaign (and which were worth not more than 13¢ per share) at prices between 70¢ and 90¢, was, undoubtedly, a more persuasive fact with the court than defendant's protestations of innocence. The stock sales reported on the Chicago Curb gave an appearance of activity and an upward trend which made it possible for defendant company's salesmen to sell, at private sales, the large block of stock

which it possessed when the so-called campaign was on.

Likewise, it is impossible to reconcile defendants' transactions with Geldermann with an innocent motive. The unconscion-.able action of Geldermann in recommending sales under the circumstances disclosed, is equalled only by the defendants' adoption of such methods in order to create the false appearance of activity in the stock and an eagerness on the part of the public to buy at constantly rising prices.

Not only does the evidence of disinterested witnesses condemn the action and the motive and intent of the defendants, but the transactions themselves, unsupported by oral testimony of witnesses, leave no doubt as to the defendants' intentions.

Defendants insist that no injunction should be granted, however, because even though they may have erred in the past and violated the above-quoted sections of the Securities Act, they expressed a desire in the District Court and an intention to refrain henceforth from such practices. They came into court with a contrite heart and with the intention to forget and forgive if the Government would meet them half way.

Undoubtedly, courts will not and do not grant injunctions to prevent that which is unnecessary, but Judge Barnes who saw and heard the witnesses and observed Koeppe on the stand evidently disbelieves his profession of good intentions so willingly made as to future business transactions. Not only does the evidence justify the court's conclusion but it was the only one that can be reconciled with defendants' cold-blooded, deliberate effort to sell stock to innocent purchasers through the subterfuge of rigging the market and giving to it an appearance of activity which was false and misleading.

Some criticism is made of the Act itself, and to the provisions which condemn these practices. As to its wisdom we are not called upon to pass judgment. It may be that it will lessen market activities on the exchanges and defeat the successful flotation of securities like these by upsetting practices long followed. Our duty is limited to the construction and application of the Act, and our conclusion is that such tradings and "such acts or practices" are against the clear and specific condemnations of the Securities Exchange Act. Nor will there be justifiable regret if the Act successfully prevents such practices even though market activities are thereby somewhat curtailed.

The decree is

Affirmed.