**CHARLES HUGHES & CO., Inc., v. SECU-
RITIES AND EXCHANGE COM-
MISSION.**

No. 154.

Circuit Court of Appeals, Second Circuit.

Dec. 10, 1943.

David V. Cahill, of New York City
(Murray R. Spies, of New York City, on
the brief), for petitioner.

Milton V. Freeman, Asst. Sol., Securi-
ties and Exchange Commission, of Phila-

delphia, Pa. (John F. Davis, Sol., Olga M. Steig, Asst. Dir., Trading and Exchange Division, and Orrin C. Knudsen, Counsel, Trading and Exchange Division, all of Philadelphia, Pa., and Irving J. Galpeer and Philip·Wagner, both of New York City, and Aaron Levy and Alfred Hill, Attys., Securities and Exchange Commission, both of Philadelphia, Pa., on the brief), for respondent.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is a petition, pursuant to § 25(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78y(a), to review an order of the Securities and Exchange Commission, entered July 19, 1943, under § 15(b) of that Act, 15 U.S.C.A. § 78o(b), in which petitioner's registration as a broker and dealer was revoked. The order developed from a proceeding which was instituted by the Commission to determine whether or not petitioner had willfully violated § 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), and § 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(c) (1). Two hearings were held on the matter before a trial examiner, who filed an advisory report recommending revocation. Exceptions, briefs, and oral argument were presented to the Commission, which then filed its findings and opinion and entered the order under review.

Petitioner was incorporated on April 9, 1940, under the laws of New York, and maintains its principal office and place of business in New York City. It is engaged in over-the-counter trading in securities as a broker and dealer, being registered as such with the Commission under the 1934 statute cited above. The dealings which resulted in the revocation were continued sales of securities to customers at prices very substantially over those prevailing in the over-the-counter market, without disclosure of the mark-up to the customers. The Commission concluded that such practices constituted fraud and deceit upon the customers in violation of § 17(a) of the Securities Act, § 15(c) (1) of the Securities Exchange Act, and its own Rule X-15C1-2.

Under the 1933 statute it was made unlawful for any person in the sale of securities in interstate commerce or by use of the mails "(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

The 1934 statute forbade a broker or dealer to make use of the mails or any instrumentality of interstate commerce to effect or induce the purchase or sale of any security, otherwise than on a national securities exchange, "by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent." Acting under this rule-making power the Commission adopted its Rule X-15C1-2, which gave two definitions of the statutory term "manipulative, deceptive, or other fraudulent device or contrivance," viz., (a) "to include any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," and (b) "to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading," and which provided in (c) that the scope of this rule should not be limited by definitions of the term contained in other rules of the Commission.

█ Petitioner's dealings which are here in question were carried out by various of its customers' men. The customers were almost entirely single women or widows who knew little or nothing about securities or the devices of Wall Street. An outline of the sales plan used with Mrs. Stella Furbeck gives a representative picture of how petitioner worked. Stillman, a Hughes & Co. agent, having her name as a prospect, called Mrs. Furbeck on the telephone and told her of a "wonderful" stock that she should buy. She replied that she was not interested. The next day he called again, and he persisted in his calls until she finally relented and made a purchase. From that time on, he and a co-employee of his, one

Armstrong, worked their way so completely into her confidence that she virtually placed complete control of her securities portfolio in their hands. Every few days one or the other would have another "marvelous" buy—one that was definitely "beyond the usual"—and she would add it to her collection, selling a more reputable security in order to finance the transaction.

The prices which Mrs. Furbeck and other customers paid for the securities purchased in this manner ranged from 16.1 to 40.9 per cent over market value. In addition, most of the transactions involved little or no risk for petitioner, because an order was usually confirmed before it bought the securities that it was selling. There is conflict in the record as to whether Stillman and Armstrong made any direct representations to Mrs. Furbeck of the relation of the price paid to market value. She claims that every time she made a purchase it was directly induced by the statement that the price would be under that current in the over-the-counter market, while they deny such statements completely. It is unchallenged, however, that at no time did either Stillman or Armstrong reveal the true market price of any security to Mrs. Furbeck or the fact that petitioner's profits averaged around twenty-five per cent. Similar evidence as to other customers all amply furnished the "substantial evidence" required by the statute to make conclusive the Commission's finding of a course of business by petitioner to sell at excessive mark-up prices without disclosure of market values to its customers. Securities Exchange Act of 1934, § 25 (a), 15 U.S.C.A. § 78y(a); Wright v. Securities and Exchange Commission, 2 Cir., 112 F.2d 89; Id., 2 Cir., 134 F.2d 733.

 Petitioner challenges the order on three grounds: (1) that § 15(c) (1) of the Securities Exchange Act is unconstitutional because of an unconstitutional delegation of legislative power and that S.E.C. Rule X-15C1-2 is invalid for vagueness, indefiniteness, and uncertainty, (2) that no violation of § 17(a) of the Securities Act was proved, and (3) that the Commission did not offer substantial evidence to establish the actual market price of the securities involved. We think none of them are to be sustained.

The objections to § 15(c) (1) of the Securities Exchange Act and to S.E.C. Rule X-15C1-2 are insubstantial. The standard for determining the acts prohibited by § 15 (c) (1) is set up in the statute itself, and is more than adequate. The fact that the devices must be "manipulative, deceptive, or otherwise fraudulent" makes certainly for far more definiteness than such a standard as was approved by the Supreme Court in Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525, and in numerous other cases. See, also, Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 240, certiorari denied 64 S.Ct. 56. As for Rule X-15C1-2, its words are almost identical with those of § 17(a) of the Securities Act, a section which has already been sustained as against the claim of vagueness. Coplin v. United States, 9 Cir., 88 F.2d 652, certiorari denied 301 U.S. 703, 57 S.Ct. 929, 81 L.Ed. 1357. This similarity makes the first claim of error appear frivolous, indeed, since no allegation is made that § 17 (a) of the Securities Act is invalid and since the revocation can be based on the violation of that section alone.

 There is evidence in the record to show a threefold violation of § 17(a) of the Securities Act, viz., the obtaining of money "by means of any untrue statement of a material fact"; the "omission to state a material fact" necessary to make statements actually made not misleading; and the engaging in a course of business which operates "as a fraud or deceit upon the purchaser." It is true that the only specific evidence of false statements of a material fact is that of Mrs. Furbeck that the sales price was under the market price, and, as we have noted, these statements were denied by the salesmen. Although the Commission has neglected to make any finding of fact on this point, we need not remand for a specific finding resolving this conflict, for we feel that petitioner's mark-up policy operated as a fraud and deceit upon the purchasers, as well as constituting an omission to state a material fact.

An over-the-counter firm which actively solicits customers and then sells them securities at prices as far above the market as were those which petitioner charged here must be deemed to commit a fraud.[1] It holds itself out as competent to advise in

---

[1] The Commission points out that the National Association of Securities Dealers, Inc., an organization registered under § 15 (a) of the Securities Exchange Act, of which petitioner was a member at the time of the transaction in question, has a rule limiting mark-up prices in over-counter securities to those which are fair, and calls

the premises, and it should disclose the market price if sales are to be made substantially above that level. Even considering petitioner as a principal in a simple vendor-purchaser transaction (and there is doubt whether, in several instances at least, petitioner was actually not acting as broker-agent for the purchasers, in which case all undisclosed profits would be forfeited), it was still under a special duty, in view of its expert knowledge and proffered advice, not to take advantage of its customers' ignorance of market conditions. The key to the success of all of petitioner's dealings was the confidence in itself which it managed to instill in the customers. Once that confidence was established, the failure to reveal the mark-up pocketed by the firm was both an omission to state a material fact and a fraudulent device. When nothing was said about market price, the natural implication in the untutored minds of the purchasers was that the price asked was close to the market. The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other. Strong v. Repide, 213 U.S. 419, 430, 29 S.Ct. 521, 53 L.Ed. 853; United States v. Brown, 2 Cir., 79 F.2d 321, certiorari denied 296 U.S. 650, 56 S.Ct. 309, 80 L. Ed. 462. "The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be relied upon to reward fraud and deception." Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141.

■ We need not stop to decide, however, how far common-law fraud was shown. For the business of selling investment securities has been considered one peculiarly in need of regulation for the protection of the investor. "The business of trading in securities is one in which opportunities for dishonesty are of constant recurrence and ever present. It engages acute, active minds, trained to quick apprehension, decision and action." Archer v. Securities and Exchange Commission,

8 Cir., 133 F.2d 795, 803, certiorari denied 319 U.S. 767, 63 S.Ct. 1330. The well-known "blue sky laws" of 43 states have in fact proved inadequate, so that in 1933 Congress after the most extensive investigations started on a program of regulation, of which this is one of the fruits. In its interpretation of § 17(a) of the Securities Act, the Commission has consistently held that a dealer cannot charge prices not reasonably related to the prevailing market price without diclosing that fact. See, among others, Duker & Duker, 6 S.E. C. 386; Jansen and Co., 6 S.E.C. 391; W. K. Archer & Co., SEA Release No. 3253; Theodore T. Golden, SEA Release No. 3404; Guaranty Underwriters, Inc., SEA Release No. 3481. Had we been in doubt on the matter we should have given weight to these rulings as a consistent and contemporaneous construction of a statute by an administrative body. United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301. As we have hitherto said of "the peculiar function" of the Commission: "One of the principal reasons for the creation of such a bureau is to secure the benefit of special knowledge acquired through continuous experience in a difficult and complicated field. Its interpretation of the act should control unless plainly erroneous." Securities and Exchange Commission v. Associated Gas & Electric Co., 2 Cir., 99 F.2d 795, 798. But we are not content to rest on so colorless an interpretation of this important legislation.

The essential objective of securities legislation is to protect those who do not know market conditions from the overreachings of those who do. Such protection will mean little if it stops short of the point of ultimate consequence, namely, the price charged for the securities. Indeed, it is the purpose of all legislation for the prevention of fraud in the sale of securities to preclude the sale of "securities which are in fact worthless, or worth substantially less than the asking price." People v. Federated Radio Corp., 244 N.Y. 33, 40, 154

---

attention to a decision of the Association's District Business Conduct Committee reported in the NASD News for October, 1943, imposing a fine of $500 and censure upon a member found to have violated rules of the Association by a practice of charging mark-ups of approximately 10 per cent on transactions in listed and unlisted securities. It also cites a decision of the Circuit Court, Sangamon County, Illinois, Matthews, Lynch & Co. v. Hughes, No. 76441, June, 1939, sustaining the revocation of registration of a dealer who took "extremely high" profits, "running in one case to 25%," and a similar interpretation of the Ohio Securities Act by the Ohio Securities Commission, 1 C. C. H. Stocks and Bonds Law Serv., p. 3331.

438

N.E. 655, 658. If after several years of experience under this highly publicized legislation we should find that the public cannot rely upon a commission-licensed broker not to charge unsuspecting investors 25 per cent more than a market price easily ascertainable by insiders, we should leave such legislation little more than a snare and a delusion. We think the Commission has correctly interpreted its responsibilities to stop such abusive practices in the sale of securities.

Petitioner's final contention is that the actual market price of the securities was never satisfactorily proved. We agree, however, with the Commission that the evidence of the quotations published in the National Daily Quotation Sheets, a recognized service giving "daily market indications," as petitioner stipulated, and the prices paid concurrently by petitioner itself sufficiently indicated prevailing market price in the absence of evidence to the contrary.

Order affirmed.