NORRIS & HIRSHBERG, Inc. v. SECURI-
TIES & EXCHANGE COMMISSION.

No. 9272.

United States Court of Appeals
District of Columbia Circuit.

Argued June 11, 1948.

Decided Sept. 6, 1949.

Mr. Joseph B. Brennan, Washington, D. C., with whom Messrs. William A. Sutherland and Carl McFarland, Washington, D. C., were on the brief, for petitioner.

Mr. Nathan D. Lobell, of the bar of the State of New York, *pro hac vice,* by special leave of court, with whom Mr. Roger S. Foster, Solicitor, Securities & Exchange Commission, Washington, D. C., was on the brief, for respondent.

Before CLARK, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

CLARK, Circuit Judge.

The documentation and literature of this case is of truly gargantuan proportions. The record proper [1] comprises some thirteen large volumes; there is also on file here what the Commission calls a Supplemental Record consisting of 849 pages; the abridgement contained in the printed joint appendix is of three large volumes— as much as a small library. Petitioner, Norris & Hirshberg, Inc., filed a printed 64-page main brief, a printed 67-page reply brief, and a printed 16-page supplemental brief. Respondent, Securities and Exchange Commission, countered with a main brief of 62 printed pages and a typewritten 13-page brief in answer to the reply brief. Yet withal there has been a strange dearth of real issues either of fact or of law and, therefore, we shall not attempt to review in detail this monumental record but shall content ourselves with a statement as brief as may be of what we conceive to be the undisputed facts and the conclusions of law applicable thereto.

Petitioner is a securities broker and dealer and has been engaged mainly in

what is known as over-the-counter business in Atlanta, Georgia, since September, 1932. It became a registered broker and dealer on January 1, 1936. Prior to the formation of petitioner, Julian R. Hirshberg and J. Goodrum Norris, its founders and owners, had both been employed as salesmen in the securities department of the Trust Company of Georgia. It is asserted, and not denied, that when they opened their own business a large number of the customers whom they had known as salesmen for the Trust Company followed them to the new firm. It is alleged by petitioner that many new customers came to the firm upon the recommendation of others and that comparatively few of petitioner's customers were obtained through solicitation although it is admitted that as many as six or seven solicitors at a time were employed by the firm. It is alleged and not denied that 75% of the firm's business was procured by Hirshberg and by Norris personally and that they individually had done practically no personal solicitation of accounts. Petitioner sold stocks and bonds both for investment and speculation, dealing extensively in municipal, Government, and corporation bonds.

Petitioner dealt in both listed and unlisted stocks and bonds. [2] In the case of listed securities that were handled for customers on a brokerage basis, transactions were effected through New York houses with whom petitioner had connections, and petitioner would charge a commission in addition to the commission charged by the exchange member. This seems to have been the customary practice in the community.

We understand that there is substantially no complaint by the Commission or any one else as to this portion of the firm's business. It is the other, and by far the greater, portion of the business of which the Commission complains and which oc-

---

1. This identical case was before this court over two years ago but had to be remanded to the Commission because the Commission had failed to provide this court with a properly assembled and certified record upon which the order complained of was entered. See Norris & Hirshberg, Inc., v. Securities and Exchange Commission, 1947, 82 U.S.App. D.C. 32, 163 F.2d 689, cert. denied, 1948, 333 U.S. 867, 68 S.Ct. 788, 92 L.Ed. 1145.

2. Since 1939, the firm has confined itself exclusively to dealings in unlisted securities.

casioned the hearing and subsequent revocation order now under review. Petitioner's transactions in local, unlisted securities have always constituted the predominant portion of its business and are now, we understand, the sole concern of the firm. The Commission raises no contention as to the financial strength and earning capacity of the issuers of these local securities and, for the purposes of this opinion, it will be assumed that these securities in themselves are sound. In other words, there is no complaint as to the type or intrinsic value of the securities in which petitioner specializes. The case is here because of petitioner's methods of dealing with those securities and with its customers with regard to those securities.

On December 28, 1943, the Commission, after a lengthy prior investigation, entered an order directing a private proceeding before a trial examiner in order to determine whether petitioner had violated any of the anti-fraud provisions of the Securities Act of 1933,[3] the Securities Exchange Act of 1934,[4] or any of the Commission's rules promulgated thereunder. The ultimate purpose of this private hearing was to determine whether or not petitioner's registration should be revoked and to determine whether any action should be taken with respect to petitioner's membership in National Association of Securities Dealers, Inc., a registered securities association.[5] This private hearing before a trial examiner was held in Atlanta on February 9, 1944. Thereafter the trial examiner filed a confidential and advisory report dated May 8, 1944, in which he concluded that no violation by petitioner of statute or rule had been proven so as to justify revocation. After oral argument before the Commission and the Commission having independently reviewed the record, the Commission, by opinion dated January 22, 1946, revoked petitioner's registration. This opinion was subsequently modified and rehearing denied by the Commission on April 17, 1946. Petitioner now seeks review of this Commission action. Petitioner's business, so far as we are aware, has continued to this date since this court by order of May 2, 1946, stayed the effectiveness of the revocation order pending further order of this court.[6]

■ As we stated in our first opinion in this case,[7] our function is "simply to see if the Commission's factual findings are supported by substantial evidence."[8] As applied to the task we faced in the circumstances of this particular case we are not convinced that the term "simply" is appropriately used. Nonetheless, we have performed that task and have concluded, as we shall indicate below, that the Commission's decision was a proper one.

It is undisputed that petitioner, during the times here in question,[9] dealt primarily with local, unlisted securities. It is also beyond dispute that petitioner specialized in the issues of the following five local companies: Haverty Furniture Companies, Inc., Southern Spring Bed Company, National Manufacture and Stores Company, Atlantic Steel Company, and Fulton Bag and Cotton Mills. As to these five securities, Hirshberg himself testified that his firm probably sold 75% of what was sold in those securities during the period in question. This is substantial evidence in support of the Commission's finding that petitioner dominated the market in those securities.

All of the fifty customers of petitioner who testified in the proceeding below had

3. 48 Stat. 74 (1933), 15 U.S.C.A. § 77a et seq.

4. 48 Stat. 881 (1934), 15 U.S.C.A. § 78a et seq.

5. Revocation of a broker-dealer registration automatically suspends the membership of the registrant in a registered association. 15 U.S.C.A. § 78o-3 (b) (4).

6. The stay order of this court was conditioned upon petitioner's stipulation that it would not engage in any acts or practices in violation of the anti-fraud provisions of the statutes cited in footnotes 3 and 4, supra.

7. Supra, footnote 1.

8. 82 U.S.App.D.C. at page 34, 163 F.2d at page 691.

9. 1935 through 1941.

margin accounts with petitioner. Many did not know what a margin account was or what a debit balance was or that they were dealing on margin. Thirty-one of the fifty were women—twelve were widows. Fifteen of the customers testifying had given petitioner express discretionary powers over their accounts. One elderly widow of very limited means stated that "everything was put in his [Hirshberg's] hands absolutely and completely." She did not understand that the firm was selling her stock it owned or buying stock from her for itself. Although she was aware that the monthly confirmations referred to petitioner as "principal," she didn't pay any attention to that and never asked, for any explanation. She received a letter from Hirshberg expressing distress at her ill health and closing "with fondest love." This witness and many others were obviously under the impression that petitioner acted as agent for them rather than as principal. Most of the witnesses believed that petitioner was dealing *for* them rather than *with* them. Though it was recognized that petitioner was in business for profit, it was very generally believed by petitioner's customers that its income was derived primarily from the commissions it charged rather than mark-ups. The record is replete with evidence that the faith and trust of the customers in petitioner was "absolute," "implicit," "perfect," "sublime," and "blind." Further, though petitioner refuses to admit that it is so, there is substantial evidence in the record in the form of customer testimony to the effect that the great majority of the customers accepted and followed the advice rendered by petitioner in almost every instance. From the facts enumerated above it is apparent, and we believe obvious, that petitioner was not only in a dominant position as to the market for its unlisted securities but that it was in a position to strongly influence and,

in fact, control what securities would be bought and what sold and the timing and frequency of such purchases and sales as well as the amount of the mark-ups and mark-downs at which they would be made. The Commission so ruled and we see no basis in the record for overturning that ruling.

■ But these factors alone, while sufficient to arouse the suspicion of persons informed in these matters, do not necessarily establish that petitioner violated the anti-fraud provisions of the Securities and Securities Exchange Acts. The stage is set, however, for fraudulent activity. It should be noted parenthetically at this point that petitioner has not been charged with or proven guilty of the practice commonly known as "rigging the market" [10] in order to artificially raise the market and unload stock at a price far above its worth. Petitioner's offense against the public interest is more subtle, though no less insidious.

The Commission charged and subsequently concluded that petitioner had violated (1) Section 17(a) of the Securities Act of 1933,[11] (2) Section 15(c) (1) of the Securities Exchange Act of 1934,[12] and (3) Section 10(b) of the latter Act,[13] as well as certain Commission rules promulgated thereunder. The record supports the charges made and the conclusions reached.

Bearing in mind constantly that petitioner had achieved the absolute and blind confidence of its relatively naive customers and that petitioner dominated the market in the five mentioned unlisted securities in which it specialized, the facts of record with respect to petitioner's business methods, as summarized below, become vitally significant. The record shows clearly that petitioner controlled at all times a large percentage of the floating supply of the five specialties. There was no system for collection and publication of market quota-

10. This practice is defined and exemplified in the interesting opinion of Circuit Judge Evans in R. J. Koeppe & Co. et al. v. Securities and Exchange Commission, 7 Cir., 1938, 95 F.2d 550.

11. 48 Stat. 84-85 (1933), 15 U.S.C.A. § 77q(a).

12. 48 Stat. 895 (1934), as amended, 15 U.S.C.A. § 78o (c) (1).

13. 48 Stat. 891 (1934), 15 U.S.C.A. § 78j(b).

tions for these specialties. Most of petitioner's customers had margin accounts thus offering the opportunity for greater trading volume as well as providing petitioner a greater degree of control over its customers' accounts. The record offers ample proof that it was an integral part of petitioner's trading system to constantly whip its specialties back and forth in its customers' accounts so that, within a short space of time, one can observe the interesting phenomenon of the same customers selling securities to petitioner and then a few days later buying the same securities back at higher prices. An analysis of one customer account reveals the astonishing proportions which this excessive trading practice of petitioner could, and did, assume.

From October, 1937, through 1941 this account "bought" about $1,400,000 and "sold" about $1,300,000 of securities with an average net investment of only $323,500. The account made 266 purchases and 191 sales during that period. About 170 of those purchases were made on the same day as sales. As applied to the five specialty securities the figures demonstrate that the account made 117 purchases and 67 sales. Of the 117 purchase transactions 37 followed intervening sales of the same security. This means that this individual account went in and out of the five specialties an aggregate of 74 times.[14]

As the Commission put it, "the heart of [petitioner's] business was the continual shuffling of securities back and forth in its customers' accounts." The record fully supports this statement. One illustration taken from the record and summarized in the Commission's opinion below will suffice. This illustration refers only to the month of December, 1935, and the figures represent petitioner's trading in one stock alone.[15] Petitioner opened the month with an inventory short 35 shares and closed the month with an inventory of zero. During the month it dealt exclusively with

its customers in that stock, that is, it neither bought nor sold any of these shares on the outside market. During the month it bought a total of 5,105 shares and sold 5,070 shares. It made a total trading profit for the month of $8,273 in that stock alone. This is, in part, how petitioner accomplished that result. On the 3rd, Customer A sold 100 shares to petitioner at 22. During the day those shares were sold to other customers at 24. On the 10th, Customer B sold 500 shares to petitioner at 22½ and petitioner sold back 100 shares to Customer A at 24. On the 4th, Customer C sold 200 shares to petitioner at 22. On the same and next day these and other shares were sold to other customers at 23 and 24. On the 16th, petitioner bought 300 shares from two other customers at 23½ and the same day sold 200 shares to Customer C at 25. On the 6th, Customer D sold to petitioner 200 shares at 22½ and, on the same day, these shares were sold to other customers at 24. On the 11th, Customer D bought back 50 shares from petitioner at 25. On the 18th, Customer D bought back from petitioner another 100 shares at 25.

With this trading practice in mind it is not difficult to perceive why petitioner realized, during the period at issue here, $530,000 in gross trading profits while its customers realized only $53,000. It also helps explain why the securities of customers held long in margin accounts showed unrealized losses of $285,000 at the end of that period. All this occurred, it will be remembered, while the trusting clients were all convinced that petitioner was acting *for* them and in their best interest. We cannot visualize any circumstances to which the statutory phrase "manipulative, deceptive, or other fraudulent device or contrivance" applies more aptly than the present one.

Petitioner's registration was ordered revoked primarily because of petitioner's failure or omission to fully disclose its trading practices and its adverse position to its

14. While the account analyzed above shows perhaps the most excessive trading from a volume standpoint, the record demonstrates that it is by no means an isolated example.

15. Haverty Furniture Company's common stock—one of petitioner's five specialties.

customers. Petitioner concedes that, except for its confirmations of purchase or sale,[16] it made no disclosure whatever to its customers. Petitioner does, however, assert that its customers were told that petitioner dealt from inventory, but the testimony of the customers themselves belies this assertion.

■ Reduced to its essence, petitioner's argument in this court with all its many facets amounts to no more than a claim that common law fraud has not been proven and that the registration cannot be revoked without such proof. We must reject such a claim. To accept it would be to adopt the fallacious theory that Congress enacted existing securities legislation for the protection of the broker-dealer rather than for the protection of the public. To say, as petitioner does, that every element of common law fraud must be proven in order to validate the revocation of a broker-dealer registration is to say that Congress had no purpose in enacting regulatory statutes in this field and that its legislation in the field is meaningless. On the contrary, it has long been recognized by the federal courts that the investing and usually naive public needs special protection in this specialized field.[17] We believe that the Securities Act and the Securities Exchange Act were designed to prevent, among other things, just such practices and business methods as have been shown to have been indulged in by the petitioner in this case. Those practices described above when viewed in the setting portrayed in this record can only be described as manipulative, deceptive, and fraudulent. There is abundant and substantial evidence of record to support the conclusion that this petitioner has completely failed to disclose to its customers the true capacity in which it was acting and the manner in which it dealt with them. This failure constituted violation of federal statute.

■ There remains only one further point for our consideration. Petitioner takes the position that, assuming arguendo that there were violations, there has been no showing or finding that petitioner's conduct was wilful. It is, of course, true that a registration cannot be revoked unless there has been wilful violation of statute. The Commission, in no less than three places in its opinion from which this review is sought, concluded that the violations were wilful. As the Commission put it, "we think its [petitioner's] technique so deliberately and so carefully designed for its own consistent advantage over customers that we must conclude its violations to have been wilful." Petitioner attacks the Commission's use of the word "wilful" and claims that that use improperly makes the term synonymous with "non-accidental." The statute contains no express definition of the term "willfully violated."[18] This court has recently had occasion to pass upon the meaning of the term in the Arleen W. Hughes case[19] and we here reaffirm what was said in that case with regard to wilfulness. In addition, as concerns the instant case, we rule that petitioner's conscious, knowing, and purposeful course of action as exhibited on this record is sufficient evidence of wilful violation to support the result achieved by the Commission.

16. Petitioner was careful to send written confirmations of its transactions which stated that petitioner either had bought or sold as principal. However, the customer testimony in the record clearly shows that the customers as a whole paid little or no attention to these confirmations. In fact, two of the customers who were lawyers testified that they had ignored the confirmations.

17. Hughes v. Securities and Exchange Commission, —— U.S.App.D.C. ——, 174 F.2d 969; Charles Hughes & Co. v. Securities and Exchange Commission, 2 Cir., 1943, 139 F.2d 434, certiorari denied, 1944, 321 U.S. 786, 64 S.Ct. 781, 88 L. Ed. 1077; and Archer et al. v. Securities and Exchange Commission, 8 Cir., 1943, 133 F.2d 795, certiorari denied, 1943, 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717.

18. 48 Stat. 895 (1934), as amended by 49 Stat. 1377–1378 (1936), 15 U.S.C.A. § 78o(b).

19. Supra, footnote 17.

234

In conclusion we desire to make it clear that our judgment is based entirely on the record presently before us in this case and we express no opinion as to the effect of possible changes in petitioner's business methods which may or may not have been achieved subsequent to the closing of the record.

We, therefore, affirm the decision of the Commission from which this review was sought. The order of this court dated May 2, 1946, staying the effectiveness of the order of revocation will, therefore, be vacated.

Affirmed.