SECURITIES AND EXCHANGE COMMISSION, Appellant,

v.

CAPITAL GAINS RESEARCH BUREAU, INC., and Harry P. Schwarzmann, Appellees.

No. 30, Docket 26942.

United States Court of Appeals Second Circuit.

Argued Oct. 13, 1961.

Decided Dec. 18, 1961.

746

Allan F. Conwill, Washington, D. C. (Peter A. Dammann, Gen. Counsel, Ellwood L. Englander, Sp. Counsel, Walter P. North, Asst. Gen. Counsel, Ned B. Stiles, Atty., and John Frohling, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for appellant.

Leo C. Fennelly, New York City (Fennelly, Douglas, Eagan, Nager & Voorhees, New York City, on the brief), for appellees.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Plaintiff (appellant), Securities and Exchange Commission (SEC), in its complaint, alleging violations of Section 206 (1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C.A. § 80b-6(1) and (2), sought a temporary restraining order, preliminary injunction and final injunction against defendants (appellees), Capital Gains Research Bureau, Inc. and Harry P. Schwarzmann, to prevent them from employing "any device, scheme or artifice to defraud any client or prospective client" and from engaging "in any transaction, practice and course of business which operates as a fraud or deceit upon any client or prospective client." By order to show cause based upon the complaint and an affidavit of an SEC investigator, a temporary restraining order was granted and a hearing upon an application for a preliminary injunction was directed. No additional proof was offered by the SEC upon the hearing; Schwarzmann, as owner of Capital Gains and as a defendant, submitted an affidavit opposing the application. The District Court upon this proof denied the motion for a preliminary injunction and vacated the stay. The SEC appeals.

Injunctive relief before a trial on the merits should be granted most sparingly and only upon convincing proof that irreparable injury will be caused unless the courts stay the defendants' conduct. Furthermore, the courts generally will not grant a preliminary injunction when the effect thereof will be to give the applicant all the relief to which he would be entitled if successful upon the final injunction trial.[1]

Applying these principles to the facts, the conclusions are inescapable that the SEC did not meet the "convincing" proof

1. W. A. Mack, Inc. v. General Motors Corp. (7th Cir. 1958), 260 F.2d 886; Foundry Services v. Beneflux Corp. (2d Cir. 1953), 206 F.2d 214, 216; Selchow & Richter Co. v. Western Printing & Lithographing Co. (7th Cir. 1940), 112 F.2d 430, 431; United States v. Adler's Creamery (2d Cir. 1939), 107 F.2d 987,

cert. denied, 311 U.S. 657, 61 S.Ct. 12, 85 L.Ed. 421 (1940); Gross v. Kennedy, 183 F.Supp. 750, 757 (S.D.N.Y.1960); Carey v. General Electric Co., 165 F. Supp. 127 (S.D.N.Y.1958); Dressler v. Wilson, 155 F.Supp. 373, 376 (D.D.C. 1957).

standard and that a preliminary injunction for all practical purposes would have given to the SEC all that it could have received by final injunction after trial.

Section 206 declares that it is unlawful for any investment adviser (1) "to employ any device, scheme or artifice to defraud any client or prospective client" or (2) "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." Fraud is the keynote of these provisions and the burden placed upon the party alleging fraud is that it be established by "clear and convincing"[2] proof.

The only question presented upon appeal at this stage of the proceedings (namely, in advance of a trial upon the merits) is whether the facts were so clear and convincing that fraud and deceit were being practiced upon defendants' clients that the District Court abused its discretion in not granting a preliminary injunction and in preferring to await the development of all the facts upon a trial before decreeing drastic injunctive sanctions.

Capital Gains publishes an investment advisory service. It distributes two bulletins, one entitled "Facts on the Funds" (not involved in this proceeding), which informs subscribers as to changes in the portfolios of Mutual Funds and another headed "Special Recommendation" or "Special Bulletin" which gives financial facts and figures concerning the specific company made the subject of the analysis. Only certain bulletins involving the special situations are before the court.

The SEC did not present in support of its application for a preliminary injunction any of the reports upon which it relied as showing a failure to disclose material facts. However, this deficiency was remedied by defendants who attached the special bulletins to their answering affidavit. In substance, the bulletins contain figures showing the corporate earnings over a period of years of the companies therein analyzed, an outline of the nature and current status of the business, future prospects, earnings and price-to-earnings ratios, (in some cases) the number of Funds which own the stock, and usually a brief résumé of assets and profits.

All seven companies [3] analyzed are substantial companies in their respective fields and their stocks have been listed and traded on the New York Stock Exchange for many years. No charge is made by the SEC that any misstatements or false figures were contained in any of the bulletins; that the investment advice was unsound; that defendants were being bribed or paid to tout a stock contrary to their own beliefs; or that these bulletins were a scheme to get rid of worthless stock. The SEC premises its entire case upon the fact that shortly before the bulletins were mailed, defendants, consistent with their forthcoming recommendations, purchased shares of the stock and, in one instance where they suggested that the stock was too high, sold short. The SEC then points to the facts that there were small market rises in each of the stocks following publication and that defendants sold the stocks previously purchased (or covered as to the short sale) by them within a week or two thereafter. Thus, the SEC by its own fiat would create a law not enacted by Congress or a regulation not promulgated by the SEC to the effect that the failure to disclose to clients to whom purchase was recommended that they (defendants), too, had made purchases, constituted a scheme to defraud by failing to disclose a material fact. But what is the "material fact"? The SEC does not and cannot argue that it consists of a belief that the stock was

---

2. United States v. Thompson (10th Cir. 1960), 279 F.2d 165, 167, wherein the court referred to "the spirit of the long accepted rule of law that one who asserts fraud has the burden of proving it by clear and convincing evidence." See also 9 Wigmore, Evidence § 2498 (3d ed. 1940).

3. Continental Insurance, Creole Petroleum, Union Pacific, Hart, Schaffner & Marx, United Fruit, Shattuck and Chock Full O'Nuts.

a "sell" instead of a "buy" because there is no proof of any such belief. Furthermore, the action of defendants was consistent with their recommendations and belies such an inference. Of the seven stocks involved, the purchases (or in one case the short sale) in most instances were made just three to seven days before the reports containing the recommendation were mailed to the clients. Thus it would appear that the purchases were the result of the forthcoming recommendations. Certainly without any supporting proof a conclusion would not be justified that the recommendations were made to enable defendants to unload their own recently acquired and comparatively small holdings.

Presumably the SEC relies upon the defendants' subsequent sales as implying a belief that the stock analyzed was not a good purchase to be held more than six months. But even a then present intention to sell shortly after publication will not support an inference that the recommendation to others to buy and hold for the capital gains period was fraudulent or deceptive. And if this be the material omission, what is the remedy? A mere statement in the bulletins that defendants also owned certain shares would accomplish nothing. Thousands of other persons owned shares of the same companies. A statement that defendants intended to sell within two weeks would not be accurate because their intention to buy, sell or hold could be determined only in the light of then unknown events. If the market were strong, they might wish to take a small profit on an "income" tax basis or hold for the six months capital gains period; if the market were weak they might wish to limit their losses by selling or holding for a longer period, hoping for a recovery. Surely, no one could be so naive as to believe that a small advisory service with only 5,000 subscribers could by its own recommending influence cause such stocks as Union Pacific (22,000,000 shares outstanding), Continental Insur-ance (12,000,000 shares outstanding) and United Fruit (8,730,000 shares outstanding) [4] invariably and automatically to rise so that defendants could always sell their small holdings at a small profit. In the one instance, Hart, Schaffner & Marx, where the company had less than one million shares outstanding, the clients were told that purchases were recommended "around the $23–24 level" (the then current price). Such advice would hardly be consistent with an inference that it was intended thereby to raise the market price by their own clients' buying power. Moreover, it is significant that the SEC introduced no proof that any client ever purchased any shares of the recommended securities. The SEC's conclusion that these particular 5,000 subscribers must have rushed in, thereby creating an artificial stimulant, is wholly speculative and is at variance with common sense. Consider realistically the buying power which comes from pension funds, investment trusts, university and hospital endowments, foundations, insurance companies and some 180,000,000 citizens with their millions available daily for investment. In the light of such a situation, the comparatively few shares out of 22,000,000 (Union Pacific) that Schwarzmann's clients might have ordered would have been as the proverbial grain of sand is to the beach. And flattering though it might be to Schwarzmann, would anyone believe that his recommendation would stem the tide of decline if some pessimistic world event were simultaneously announced, some Mutual Fund chose to sell or an estate had to be liquidated?

The SEC contends that present intent to sell a stock in the near future if it rises must be accepted as conclusive proof that the advice to buy was dishonest and fraudulent. However, do not the vast majority of those who buy hope to sell at some time at a profit? When the sale will take place can be determined only by considerations personal to each purchaser. His own financial needs, his

4. Approximate figures.

trading policy, his habit of accepting small profits or his policy of buying for the so-called long pull will control his actions. Of necessity, every purchase and sale transaction involves diametrically opposed thoughts by two individuals concerning the same stock but this does not create fraud and deception so long as false facts and figures have not motivated their action.

The result reached by the District Court in no way weakens the praiseworthy role of the SEC in its vigilant protection of unwary investors. The SEC correctly argues that federal securities laws are to be construed broadly to effectuate their remedial purpose. Nor can there be any serious dispute that a relationship of trust and confidence should exist between the adviser and the advised. A good example of a violation of this principle is found in S. E. C. v. Torr:[5]

> "When a person gives advice to buy a stock under circumstances that lead the listener or reader to believe that the advice is disinterested, and suppresses the fact that for giving such advice he is in reality being paid by one anxious to sell the stock, the purchaser acting on the advice is imposed upon and deceived."

Another illustrative situation is Ridgely v. Keene, 134 App.Div. 647, 119 N.Y.S. 451 (1909), where an investment adviser failed to disclose that he was being paid to tout a stock.

The SEC's exception to the District Court's comment that there is no proof that any client lost any money by reason of defendants' acts is also well taken. The test is not gain or loss. It is whether the recommendation was honest when made.

The many cases cited by appellant and appellees are not germane to a resolution of the problem here presented. For the most part, they deal with the purchase and sale of securities by or through brokers where inside or so-called confidential information was possessed by one party to the transaction which was not disclosed to the other. These situations are typified by the recent decision of the SEC in "In the Matter of Cady, Roberts & Co.—No. 8-3925" (Nov. 8, 1961) wherein a broker having received advance notice of a substantial reduction in a company's dividend sold large quantities of the stock to purchasers who had no knowledge of the dividend cut and who undoubtedly would not have purchased (at least at the then quoted price) had they known the facts.

Nor is the decision of the District Court in any way at variance with the salutary purpose of the Investment Company Act of 1940 or the Investment Advisers Act of 1940. This court said in Charles Hughes & Co. v. S. E. C. (2 Cir., 1943), 139 F.2d 434, 437, "The essential objective of securities legislation is to protect those who do not know market conditions from the overreachings of those who do * * *." (Clark, C. J.). And so it is. However, each case must be judged upon its particular facts after a full and fair hearing and not upon unwarranted inferences.[6]

In final analysis what the SEC would have the court do here is to create a law which Congress has never enacted or a regulation which the SEC has never promulgated which, in effect, would prohibit investment advisers or their employees from purchasing or selling any of the many stocks covered by their services. Any such drastic legislation or regulation should be enacted only after hearings

5. 15 F.Supp. 315, 317 (S.D.N.Y.1936), rev'd on other grounds (2d Cir. 1937), 87 F.2d 446.

6. See Hughes v. Treat, 22 S.E.C. 623 (1946), where the proceedings were dismissed on the facts; Litigation Release 372 on S. E. C. v. Todd, cited in 3 Loss, Securities Regulation, 1516, n. 122 (2d ed. 1961), where although the defendant had originally consented to an injunction, it was vacated without objection by the SEC in order to permit a trial on the merits and eventually the SEC agreed to a dismissal because the provable facts would not have supported an injunction.

upon which the need, if any, for any such remedial legislation can be explored and all interested parties given an opportunity to be heard. Any such regulation should come only as suggested by the Supreme Court in Miner v. Atlass, 363 U.S. 641, 650, 80 S.Ct. 1300, 1306, 4 L.Ed.2d 1462 (1960) with respect to procedural innovations "only after mature consideration of informed opinion from all relevant quarters, with all the opportunities for comprehensive and integrated treatment which such consideration affords."

The benefits to be derived by the investing public, which otherwise would have no adequate basis for forming an opinion, as a result of receiving advice honestly given based upon the analysis of financial experts, scarcely can be doubted. A senior financial statesman, Bernard Baruch, has said:

> "What of the man or woman with modest savings who is simply looking for a fair return on his or her savings and who cannot give full time to a study of investments? My advice to such persons is to seek out some trusted investment counselor." [7]

Congress and the SEC have been watchful of the interests of the investor. In September, 1960, Section 80b–6 was amended and subparagraph (4) was added (74 Stat. 887, P.L. 86–750 § 9) giving to the SEC the power to "by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." As stated in Senate Report No. 1760, June 28, 1960, U.S.Code Congressional and Administrative News, 1960, p. 3510 (the Senate bill was passed), "This provision would enable the Commission to deal adequately with such problems as a material adverse interest in securities which the adviser is recommending to his clients." Acting thereunder the SEC in August, 1961, published its revised proposal to adopt its first Rule (Rule 206

(4)–1) which declared certain advertisements by investment advisers to be fraudulent, deceptive or manipulative within the meaning of Section 206(4) of the Act. The SEC invited comments and suggestions on the proposals and after careful consideration thereof adopted a Rule, effective January 1, 1962. The stated and obvious purpose of the future date was to give persons and companies affected thereby an adequate opportunity to know the prohibition before they were condemned for violating it. (See, SEC Release No. 121, Nov. 2, 1961.) The same charge of fraud and deception might have been made against previous advertisements because it is common knowledge that for decades the public press has carried advertisements of investment advisory or stock trading services that listed their profitable selections and minimized or omitted their less successful recommendations. Believing that such advertising is deceptive and misleading, the SEC directs its discontinuance. But believing equally in fair play, the SEC affords a reasonable opportunity for compliance rather than seeking an immediate injunction against the advertising now in effect.

It is most significant that there is no statute, rule or regulation against any investment advisory service owning any shares of any security recommended or against the purchase or sale of any such shares within a specific period of time before or after publication. Whether such a rule would be in the public interest is not for judicial legislation or adjudication. The SEC has been charged by Congress with the making of such rules. The SEC has evinced a wise policy of promulgating its rules only after a careful study of all the facts, the holding of hearings, the weighing of testimony from interested parties, and consideration of comments and suggestions. Hundreds of individuals and companies are engaged in the business of investment advisers. What is the impact, if any, on the market of the investment ad-

7. Baruch, My Own Story (1957).

vice of any one bulletin? Of what influence, if any, is the number of subscribers (1,000 or 50,000)? What if one service recommends the sale of a certain stock simultaneously with the independent recommendation of another service to purchase the same stock?[8] Is fraud to be presumed; and, if so, by which service? Countless other questions suggest themselves with which, if there be any need for regulation or control, the SEC will have to cope. For the present and until the facts are fully developed, it seems appropriate that the courts in piecemeal fashion do not try to take over the regulatory function of the SEC and single out a rather small advisory service and hold it in advance of trial responsible for violation of a rule which has not yet been promulgated and as to which there is no certainty that it ever will be.

The order denying a preliminary injunction is affirmed.

WATERMAN, Circuit Judge, concurs in the result.

CLARK, Circuit Judge (dissenting).

It can be demonstrated, I believe, that my brothers here have given a uniquely restrictive interpretation to the Investment Advisers Act of 1940—the last of the six great regulatory statutes governing dealings in investments—contrary to the general judicial approach to these statutes. But before I discuss this troublesome ruling I think I should note the unfortunately wide scope of the decision and its public importance. For it endorses and in effect validates a distressingly low standard of business morality. Cutting through all the procedural steps and noting the denial of the very mild and nonpunitive remedy of an injunction only preventing future violations, I find it all too clear that the opinion here, reemphasizing the opinion below, has found nothing objectionable, much less illegal, in an investment adviser—a business fi-

duciary according to the intent of the regulatory statute—making substantial profits by secretly playing the market contrary to his advice to customers. I suspect the license thus granted is one the top advisers—those who are trusted by the banks, the insurance companies, and the investors generally—not only do not desire, but find rather shocking, in the doubt thus cast upon the good faith and loyalty of all of their profession. For all are thus reduced, in the eyes of the law, to the standards of the lowest.

While the over-all trend of the decision is thus obvious, the opinion does not make the facts or the law sufficiently clear to clarify the central legal issue. Actually the facts are substantially not in dispute; and the issue is whether the prohibitions of the Act, particularly those which prohibit engaging in any course of business "which operates as a fraud or deceit upon any client or prospective client," 15 U.S.C. § 80b–6(2), are limited strictly to common law fraud, as the district court held, or express a wider fiduciary obligation of full disclosure of conflicting ties and full loyalty to the client's interest. As to the facts the SEC—with commendable expedition and zeal, considering all the ramifications of its far-ranging tasks and the difficulties of detection generally—uncovered a half-dozen cases of private stock dealings by defendant Capital Gains at the behest of its sole stockholder and owner, Schwarzmann. These the Commission quite properly accepted as a pattern of defendants' normal activities, sufficient upon which to base a prayer for a preventive remedy for the future. The pattern was that Capital Gains would privately buy some well known stock for its private account, that it would describe the stock favorably in its bulletin "Special Recommendation" or "Special Bulletin," distributed to its 5,000 subscribers and frequently quite widely to the public on a mailing list of about 100,000, and that then in a few

---

8. The daily press and financial journals in reporting upon changes in Mutual Funds portfolios frequently disclose that the business judgment of one Fund dictated the sale of a certain stock at approximately the same time that another Fund considers the same stock an advisable purchase.

days, perhaps a couple of weeks or less, when the market price of the stock had risen, it would sell out, pocketing the gain. Apparently it did not look for spectacular market swings, but nevertheless it was able to achieve fairly steady profits from this course of dealings. In one spectacular case it combined this scheme successfully with the short selling of a stock it then proceeded to decry in its report as overpriced.

Defendants did not deny these specific instances, but attempted to play them down, stressing particularly that their operations were too small to cause the market swings and that their clients did not lose because the stocks were good investments. Of course it is difficult to tell surely what will cause a good stock to go up a few points; but it seems likely that concentrated buying may have some effect, and it is significant that in each case the market did actually respond in the way desired. But this defense, which has been fully accepted by my brothers, completely misses the point. A first duty of a fiduciary is loyalty to his beneficiary; if he is engaged in feathering his own nest, he cannot be giving his client that wholly disinterested advice which it is his stock in trade to provide. My brothers appear to assume that the practices indulged in by the defendants here are quite widespread on the part of investment advisers. There is not a bit of evidence before us to this effect, and personally I do not believe it for a minute. But further it appears quite clear that it was the purpose of the legislation to outlaw and stop such practices.

The history of this legislation shows a Congressional intent to establish a fiduciary relationship on the part of the adviser to his client; it also shows a purpose to safeguard bona fide investment counsel against the stigma of the activities of unscrupulous tipsters and touts. This is convincingly traced by the leading academic authority in the field, 2 Loss, Securities Regulation 1392 et seq. (2d Ed. 1961). It is quite obvious that this broad and complete supervision of the adviser who was required by the Act to register would be quite frustrated if the Commission had to show at every step common law fraud, including intentional misrepresentation to a specific person to his individual loss. Actually there is convincing evidence to the contrary. As Professor Loss, after quoting the two subsections relied on by the Commission, § 206(1) and (2), 15 U.S.C. § 80b–6(1) and (2), points out: "These clauses are modeled on Clauses (1) and (3) of § 17(a) of the Securities Act [15 U.S.C. § 77q(a) (1) and (3)]. Consequently, everything which has been said thus far in this chapter applies with equal force to investment advisers *mutatis mutandis*." 3 Loss, Securities Regulation 1515 (2d Ed. 1961). This carries his discussion back to his earlier detailed consideration of SEC "fraud" concepts going well beyond circumstances giving rise to a common law action of deceit. 3 Loss, Securities Regulation 1430, 1435, 1474 (2d Ed. 1961), with citation of cases such as Charles Hughes & Co. v. SEC, 2 Cir., 139 F.2d 434, 437, certiorari denied 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077; Hughes v. SEC, 85 U.S.App. D.C. 56, 174 F.2d 969; Norris & Hirshberg, Inc. v. SEC, 85 U.S.App.D.C. 268, 177 F.2d 228, and other cases cited in 3 Loss, id. 1435 n. 19. A fiduciary who recommends the purchase of a particular stock because or after he has secretly taken a position in that stock which will make his recommendation profitable for him is guilty of deception if he conceals the secret motive underlying his advice. Indeed, this appears to be the law even without statute. Ridgely v. Keene, 1909, 134 App.Div. 647, 119 N.Y.S. 451, 453.

In 1960, upon recommendation of the SEC and with the announced purpose of tightening up the Act, a series of amendments were passed. 2 Loss, id. 1395; 3 Loss, id. 1515–1518. There was then added to this statute by amendment of Sept. 6, 1960, 74 Stat. 887, a fourth paragraph, 15 U.S.C. § 80b–6(4), which is important enough here to quote: "to engage in any act, practice, or course of business which is fraudulent, deceptive,

or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

Since most of the events here involved took place before the statute became effective, the SEC has not relied on it to sustain the requested injunction, though it would seem that the first sentence could be cited to support the prospective remedy here sought which operates only in the future. It should be particularly noted that the provision adds powers and terms of regulation; it nowhere cuts down or reduces them.

Curiously enough my brothers seize upon this statute to cut down the clear grant of authority expressed in words already defined in the earlier statutes. While seemingly agreeing that the new statute gives the Commission the authority to proceed against practices of the general type here involved, they state that this authority cannot be exercised until a specific rule outlawing this precise behavior has been promulgated. But the statute is eloquently silent as to any such condition, and is in terms broadly prohibitive. And the argument misconceives the significance of the grant of rule-making power. It is Congress which declares the policy and defines the prohibitions, while the SEC is authorized to adopt regulations not to vary, but to aid in the execution of, the policy. Cf. SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. Here the SEC with commendable expedition, having in mind the necessity of extensive hearings and full consideration of the various interests needing to be heard, has substantially completed work upon at least preliminary regulations under this statute. It is to be noted that those already published seem shrewdly framed

in terms of ways and means for the better effectuation of the policy, rather than its variation.[1] In my judgment, therefore, the new statute has been put to a wholly improper argumentative use; it supports rather than undercuts the Commission's position.

My brothers find various procedural objections to an injunction *pendente lite* here, citing a variety of legal clichés which have certain fields of operation, but which are quite inapposite here. Thus the injunction was not refused by the district judge as a matter of discretion weighing the equities; it was refused on the basis of an erroneous ruling of law, and a claim of right thereto by the defendants. Of course we must and do correct such mistakes as a matter of course on appeal from a denial of injunctive relief, see, e. g., Ring v. Spina, 2 Cir., 148 F.2d 647, 160 A.L.R. 371. Then there is the statement that a preliminary injunction should not grant what is being sought permanently. This means only that a case should not be prejudged prior to a full hearing beyond what is necessary fairly to preserve the parties' right. Of course it cannot mean—and this is belied in daily practice—that an injunction cannot issue when the plaintiff's right to ultimate relief is shown; that would be to say in effect that the better the plaintiff's case, the less chance he has for any remedy until a possibly protracted trial is completed. Here there is a strong public interest involved, both on the part of the investing public and on the part of other investment advisers whose reputation is being sadly traduced by the defendants' activities. On the other hand, the defendants are little prejudiced by the nonpunitive injunction sought, which merely directs them in the future to follow that course of conduct which they ought to wish to do anyhow, particularly if they would retain any shred of reputation as a trustworthy

---

1. The opinion cites SEC Release No. 121, Nov. 2, 1961, dealing with fraudulent, deceptive, or manipulative advertising by investment advisers. It should have cited SEC Release No. 120, Oct. 16, 1961, re-quiring registration of stock dealings by advisers *and their staffs*. These proposed regulations are obviously means and devices to effectuate the declared policy of the statute, not to make different policy.

**754**

adviser. Further it will relieve this important commercial court of the stigma of supporting low business practices. The decision below should be reversed for the grant of an injunction *pendente lite*.