**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**Mitchell MAY, Jr., Alfred W. Parry, Wil-
bur E. Dow, Jr., individually and as
members of Independent Stockholders
Committee of Libby, McNeill & Libby,
and Libby, McNeill & Libby, a corpora-
tion, Defendants.**

United States District Court
S. D. New York.

Aug. 15, 1955.

William H. Timbers, Washington, D. C., Bruce L. Carson, Chicago, Ill., Ezra Weiss, New York City, Alfred Letzler, Arlington, Va., of counsel, for the Securities Exchange Commission.

Gordon, Brady, Caffrey & Keller, New York City, for individual defendants Mitchell May, Jr., Alfred W. Parry, Jr., Wilbur E. Dow, Jr., individually and as Members of Independent Stockholders Committee of Libby, McNeill & Libby, Leo Brady, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendant Libby, McNeill & Libby, Thornton C. Land, Thomas W. Kelly, New York City, of counsel.

LUMBARD, Circuit Judge.

This is a motion by the Securities and Exchange Commission to enjoin preliminarily Mitchell May, Jr., Alfred W. Parry, Jr., and Wilbur E. Dow, Jr., individually and as members of an Independent Stockholders Committee of Libby, McNeill & Libby from soliciting through the mail or in interstate commerce any proxies in respect to the common stock of Libby, McNeill & Libby by

means of any proxy statement or other communication which is false and misleading with respect to any material fact or which omits to state any material fact with respect to certain listed subjects. The injunction is also sought against soliciting any proxies without disclosing the names of all persons on whose behalf the solicitation is being made or the names of all the persons for whom the cost of solicitation will be borne, directly or indirectly. Libby, McNeill & Libby is a corporation whose stock is registered on the New York Stock Exchange, the Midwest Stock Exchange, and the San Francisco Stock Exchange.

The Commission also asks that the Committee be restrained from using any proxies already obtained. The Commission in its complaint filed on the same day, August 3, 1955, joined as a defendant the Company, Libby, McNeill & Libby. The Company as well as the three individual members of the Independent Stockholders Committee have appeared on this application.

## I—History

Before turning to the specific allegations of the Commission's complaint, it may be helpful to outline the events which led up to its filing. On May 18, 1955 May and Parry representing themselves as an independent stockholders committee filed with the Commission a draft of a proposed proxy statement which the Committee proposed to send to Libby stockholders. Apparently because the Commission believed that the material submitted was deficient in several material respects, on June 6, May and two of the Committee's counsel conferred with members of the Commission's staff regarding these matters and the requirements of the proxy rules. The Commission was advised that Dow and Lawrence E. Brinn would be added to the Committee. It was understood that the material would be amended and that additional information would be supplied to the Commission.

About June 23 the Independent Stockholders Committee, now including Dow and Brinn, filed a further proposed proxy statement which did not include names. of nominees for directors, which names. were to be supplied shortly thereafter. At this time May conferred with Commission staff members and advised them that the information requested at the June 6 conference regarding purchase of the stock by Committee members, associates and backers would not be furnished.

On July 1 the Committee filed a further revised proxy statement which did not include the names of nominees for directors but it did list six persons who had already contributed or agreed to contribute specified sums toward solicitation expenses:

| | |
|---|---|
| Walter W. Weismann | $5,000. |
| Mitchell May, Jr. | 5,000. |
| George Frankel | 5,000. |
| Ladislas Pathy | 2,500. |
| Alfred W. Parry, Jr. | 1,500. |
| Max Rosenfield | 5,000. |

On July 6 the Commission wrote Committee counsel requesting information regarding certain persons named in the proposed proxy statement, including Committee members, and persons represented by them, and inquiring as to the nominees for directors. Meanwhile on July 7 the Committee filed a further proxy statement giving the names of six nominees for directors and stating that the expected cost of proxy soliciting would be approximately $25,000.

On July 8 the Committee filed for the first time a proposed letter to stockholders captioned "It's Time For a Change". This letter included the material complained of regarding comparison of Libby with other companies and alleged misleading questions implying manipulation of funds and non-disclosure of information.

On Monday, July 11 the Commission received from Committee counsel a letter dated July 7 stating that the Committee

was unwilling or unable to furnish all the information requested in the Commission letter of July 6. The letter also advised that the Committee intended to proceed on July 11 "with the mailing of the Proxy Statement heretofore filed with you and also the letter to stockholders forwarded to you on this date under separate cover".

On the same day, July 11, the Commission wired Committee counsel advising that the proposed letter to stockholders was inaccurate and misleading in material respects, and that it should be accompanied by a proxy statement and should not be released until amended to comply with the Commission's proxy rules. The information which had been asked for in the July 6 letter was again requested. Mr. Harvey A. Thorson of the Commission telephoned Committee counsel and read him the wire, and he and Mr. Ralph Hocker talked to counsel regarding the misleading nature of the proxy material and urged that it be not released until corrected. Mr. Hocker made it clear that if the Committee persisted in its proposed action the Commission might have to go to court.

On July 12 the Commission received a letter from Committee counsel repeating the refusal to comply with the Commission's July 6 letter request. Enclosed copies of a further draft of the proposed Committee proxy statement for the first time disclosed the full slate of nine nominees. On July 13 the Commission received from the Committee definitive copies of the proxy material, and by telegram on July 14 the Committee advised that the material was being mailed.

In the proxy material which the Committee mailed to stockholders under date of July 13 it was stated for the first time that proxy soliciting expenses would be approximately $75,000. Instead of the six individuals theretofore listed as pledging or contributing $24,000 toward these expenses, the names of George Frankel and Max Rosenfield were now omitted. Nothing was stated as to who would defray the balance of approximately $61,000.

Thus up to the time of mailing the proxy material to stockholders the Committee refused to fully inform the Commission regarding important and material matter; it submitted much new data at the last minute, and virtually refused to consider the Commission's views or to discuss the questions raised by members of the Commission's staff.

Thereafter on July 21 the Commission ordered a "private investigation" to inquire into possible violations of its Regulations by the Company or the Committee or any of their agents, etc., and designated certain of its staff to conduct the investigation. Immediately following July 21 the president of Libby, McNeill & Libby, the members of the Committee and others were examined under oath in Chicago and New York.

On August 3 the Commission filed its complaint. By order to show cause signed the same day the Commission brought on this application for temporary injunction. Judge Dimock at that time denied an application for a temporary restraining order pending the hearing of this application.

## II—Allegations of Complaint

The complaint filed by the Commission pursuant to Section 21(e) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78u(e), and the affidavits filed in support of this application, charge the Committee with having made false and misleading statements in printed matter sent to the stockholders soliciting their proxies for the annual meeting of the Company which is to be held August 17, 1955 at Portland, Maine, with omitting certain material facts necessary in order to make the statements not false or misleading, and in other respects failing to comply with Regulation X–14 relating to the solicitation of proxies and promulgated by the Commission under the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. These alleged false and misleading statements and alleged material omissions fall into five principal categories:

### 1. Comparison of Libby with Other Companies.

Representations and omissions regarding comparative earnings of the Company and other companies in the business of distributing food products for the years 1939 and 1953. These were set forth in the "Time for a Change" letter to stockholders dated July 13, 1955.

### 2. Misleading Questions Implying Manipulation of Funds and Non-Disclosure of Information.

A series of questions contained in the same letter of July 13 to the stockholders. The Commission charges that these questions imply misuse of funds and mismanagement and failure to make certain disclosure of allegedly material facts to the stockholders where the Committee has no basis for implying an improper action or omission on the part of management.

### 3. Dow's Alleged Representation of Stockholders.

Statements by the Committee that the defendant Dow was acting on behalf of certain named stockholders, when in fact none of these individuals had authorized him to act as a Committee member on their behalf and in fact two of them had protested to Dow against such unauthorized use of their names.

### 4. The Composition of the Committee and its Financial Backers.

The Committee's misrepresentation of the circumstances leading up to its formation and the identity, associates and purposes of the individuals who have spearheaded, sponsored and underwritten its activities, and its violation of Items 3–B and 3–C of Regulation X–14 by failing to state all the names of persons on whose behalf the solicitation is being made, and all the persons by whom the cost of the solicitation has been or will be borne.

### 5. Purpose of the Committee.

The Committee's failure to disclose that its real purpose is to sell off the company's assets and liquidate its business.

\* \* \* \* \* \*

A number of the items objected to by the Commission in the proxy materials distributed by the defendants are cast in the form of questions. Although Rule X–14A–9, 17 Code Fed. Regs. Sec. 240.14a–9 (Supp.1954), forbids in terms the use in proxy solicitation of "any statement" which is false or misleading, it would be an unrealistic strictness of interpretation which did not include within this term questions which are based upon false or misleading assumptions or which carry false or misleading implications. To hold that merely by placing a question mark at the end of a sentence the author can circumvent the requirements of fair and complete disclosure would provide an obvious escape from the salutary regulation of the Commission. Support for a broad interpretation of the word "statement" may be found in the holding of the Court of Appeals for the Second Circuit that an expression of opinion in a proxy statement may violate an injunction enforcing the SEC's proxy rules, Securities and Exchange Comm. v. Okin, 2 Cir., 1943, 137 F.2d 862, 864.

### III—Specific Findings

With respect to the following findings a prefatory statement must be made. Many of the statements and questions printed in the defendants' proxy materials can only be properly understood in the light of the context in which they appear, the factual background, and the published reports and statements of the Company. Many of the implications found in defendants' material arise, not from the words alone, but from the words as seen against the background of all the circumstances existing at the time the statement or question was published.

### 1. Comparison of Libby with Other Companies.

The Commission complains that the comparison of net earnings contained

in the "Time for a Change" letter was misleading in that it compared the net earnings of Libby with those of Stokely, Van Camp, Hunt Foods, Clinton Foods, Standard Brands, Best Foods, and General Foods without explaining the differences between Libby and those companies. The comparison is also claimed to be misleading in that it implied that the present management was responsible for the earnings history during the entire period 1939–1954. These arguments do not convince me that the use of figures here is so misleading as to constitute a violation of the Commission's proxy rules. There is no contention that the figures themselves are incorrectly stated. We are all aware that comparisons are not as simple as figures sometimes make them appear. No compilation can give the true picture without substantial explanation; the very process of selection and arrangement is a form of argument. This seems to me to be a field where the Commission and the Courts must tread warily else they may unduly curb legitimate statistical debate. The Company has answered the statistical arguments of the Committee with arguments, explanations, and compilations of its own. Although a greater seasoning of explanation might be more to the taste of the bedeviled stockholder, I think the better course here is to let him compare the figures presented by both sides and give the statistical arguments what weight he wishes.

2. *Misleading Questions Implying Non-Disclosure of Information and Manipulation of Funds.*

The Commission charges and this Court finds that the following questions and statement in the "Time for a Change" letter are misleading in that they imply improper non-disclosure by the Company when no such impropriety exists:

(1) "Why isn't a full disclosure of the Company's business made to the stockholders each year?"

(2) "Are we not entitled to know how much is made or list in the major lines—pineapple, canned fruits, canned vegetables, fruit juices, salmon, and frozen foods— and how much money is invested in the production facilities for the various items?"

(3) "Why are not the stockholders informed of the purchases and sales of capital assets?"

(4) "Only a strongly entrenched and self-perpetuating management would dare withhold from its stockholders a detailed accounting for three months operations, namely, February 27, 1954 to May 28, 1954."

The first question implied that the Company did not make a full disclosure to its stockholders of those details of its operations which it is customary for similar companies to disclose. The Company did in fact disclose in its annual reports and in its filings with the SEC such matters as it is customary for similar companies to disclose.

The second question implied that it is customary and proper to disclose to stockholders how much is made or list in the "major lines" and how much is invested in the production facilities for each line. Clearly such disclosure is not customary. In fact such details are generally guarded with care lest competitors be given information which might be harmful to some branch of the company's business.

The third question implied that it is customary to disclose to stockholders the details of the purchase and sale of particular capital assets. Clearly such disclosure is not customary.

The fourth question implied that the Company withheld from its stockholders a proper accounting for the period from February 27, 1954 to May 28, 1954. I find that the Company made a proper accounting to its stockholders for this period in its annual report for the year ending in May 1955 and in its Form 10–K filed in January 1955 with the SEC and the New York, Midwest and San Francisco Stock Exchanges, and that

the Committee and its members knew that such accounting had been made.

The Commission charges and I find that the following questions in the "Time for a Change" letter imply that the management was guilty of improper manipulation or mismanagement of corporate funds when there was no basis in fact for such implication:

1. "Isn't it odd that during this unaccounted for period Bridges looked around and found that nearly $4,000,000 of the Company's fixed assets were no longer in existence and had to be written off?"

2. "Why hasn't Bridges told the stockholders the status of his Pension Fund?"

3. "Where is the money and what is being done with it?"

4. "Is there $10,000,000, $15,000-000, or $20,000,000 of the stockholders' money in this Pension Fund?"

5. "How much of the stockholders' money (taken out of profit) is in the big inventory account? If it is $10,000,000, as Bridges says, it represents $3 a share of the stockholders' money. If it is $30,000,000 or $35,000,000, as has been stated, it represents nearly $10 per share of the stockholders' money."

■ The first item implied (a) that the period from February 27 to May 28, 1954 was unaccounted for, (b) that it was during this three month period that the whole amount of "nearly $4,000,000" was discovered to be not in existence, (c) that none of this "nearly $4,000,000" was written off prior to the three month period, (d) that there was something improper or dishonest about the transaction. The facts are (a) that the period in question was properly accounted for, as is set out above, (b) that no more than $359,333 of assets were discovered to be not in existence during the period in question, the rest having been discovered prior to that time in the course of a survey of the Company's properties begun in the fiscal year 1953, (c) that only $359,-333 of assets were written off during the period in question, $3,367,719 having been written off prior to that time, (d) that there was nothing dishonest or improper about this transaction since the write-off was the result of a survey intended to make the books of the Company correspond more closely with its physical assets and was in accordance with accepted accounting practice.

■ Questions 2, 3, and 4, taken together, imply (a) that the Company has failed to disclose facts about the Pension Fund which it is customary and proper to disclose, (b) that there is some impropriety or dishonesty in the management of the Pension Fund. I find that (a) the Company has not failed to disclose facts about the Pension Fund which it is customary and proper to disclose, (b) that there is no basis for an insinuation of impropriety or dishonesty in the management of the Fund.

■ Item 5 implies that the $10,000,-000 spread between the book value of the Company's LIFO inventories and their replacement cost is in some sense taken out of profit and withheld from the stockholders. This $10,000,000 is no more taken out of inventory and withheld from the stockholders than is that portion of the inventory's value which is represented on the books. It is true that amounts tied up in inventory are not available for distribution to the stockholders. This applies, however, to the total inventory value, not just the value in excess of that shown on the books. Under these circumstances the implication of question 5 is false and misleading.

\* \* \* \* \* \*

Perhaps it could be argued that each or any one of these questions would not be likely by itself to influence any stockholder to execute the proxy. But taken together one after another as set forth in the "Time for a Change" letter they certainly would raise a question in the mind of the average stockholder as to whether the management of the Company was in honest and capable hands. It is clear that the questions were designed to do just that. If there were some basis

for the questions then there could be no objection. But as there is no basis for asking any of them, it seems to me that the questions separately, and as a group, are grossly misleading and constitute a wilful violation of the Regulations.

### 3. *Dow's Alleged Representation of Stockholders.*

In the July 13 proxy statement mailed to stockholders the Committee stated that defendant Dow was acting on behalf of five named Libby stockholders. Included in this list were Lawrence C. Calvert and Raymond C. Anderson, holding 1,300 and 300 shares respectively. These two later wrote Dow objecting to the use of their names as they stated that they had never authorized such use. In the private examination of defendant Dow he admitted that he had not been authorized so to represent Calvert and Anderson. He explained his action on the ground that at a prior time they had orally expressed dissatisfaction with the management of Libby. This misstatement the defendants sought to correct in a last page addendum to a letter to stockholders dated August 5. Anderson wrote Dow that Dow had used his name without authorization. Calvert wrote Dow that at no time had he had any intention of allowing anyone to represent him. These repudiations are referred to in the August 5 letter as though Anderson and Calvert had changed their minds on the subject, which was clearly not the fact. This reference in the August 5 letter is an inaccurate statement of the facts, and it is an inadequate correction of the misrepresentation in the July 13 letter. That a committee member does or does not represent two fairly substantial holders of stock is a material matter as it may well be of considerable persuasive value in obtaining proxies from many stockholders.

### 4. *The Composition of the Committee and its Financial Backers.*

The affidavits and exhibits make it clear that Bernard Frankel has been a leading factor in the formation and activities of the Independent Stockholders Committee. In the summer of 1952 Bernard Frankel discussed with the defendant Parry the advisability of acquiring shares of Libby. As a result of this, Parry started to acquire shares and Frankel told Parry that he too was buying shares. (Statement of Parry submitted to the Commission, June 20, 1955.) While Bernard Frankel holds no shares in his own name and claims that he has no beneficial interest in any shares his wife owns 9,300 shares and his brother George owns 10,000 shares.

In 1952 on two occasions Bernard Frankel and Parry discussed questions concerning Libby management with Fred P. Slivon, Secretary and Treasurer of Libby. Frankel, either alone or with others, had numerous conferences with Company officials on numerous occasions in 1953, 1954 and 1955.

It appears from the statement of the defendant, Mitchell May, Jr., filed with the Commission, that in the early part of 1954 he began acquiring shares in the Company following talks with Bernard Frankel and Frankel's wife. Following talks with Frankel, May went to Chicago with Frankel and conferred with Libby officials about the Company's business. By that time May had acquired 10,000 shares of stock.

The record does not show just how the third member of the Committee, the defendant Dow, became interested in the work of the Committee, although his own statement to the Commission shows that he has known Bernard Frankel for five years.

Of those interested in the objectives of the Independent Stockholders Committee the defendant May and members of his family are the largest holders of stock with 30,800 shares. Next in stock owning importance is Walter W. Weismann who is now an owner of 18,950 shares. Weismann was contacted by Bernard Frankel sometime in 1954 at the suggestion of the defendant May, according to Bernard Frankel's statement submitted to the Commission. Weismann

went to Chicago in June, 1955 and conferred with Libby's president, Charles S. Bridges, regarding the management of Libby. He stated that members of his group included Bernard Frankel, Mitchell May, Jr., Alfred W. Parry, Jr., Wilbur Dow, Lawrence E. Brinn and Max E. Rosenfield.

Bernard Frankel also interested one Lawrence I. Becker, a consultant in food technology, in March 1955. It was through Frankel that Becker, who made a large number of contacts for the Committee until the end of June 1955, contacted Lawrence E. Brinn, who recently has acted as co-counsel of the Committee. Following the suggestions of Bernard Frankel and Brinn, Becker contacted numerous Companies and people who might be interested in future business arrangements with Libby if the Committee's plans should succeed. These concerns were urged to buy stock in Libby to assist the Committee in bringing about a change in the management.

More recently in May, 1955, it was Frankel and May who decided the location of the Committee's offices at 149 Broadway, New York.

In the proposed proxy statement of the Committee delivered to the Commission on July 1, 1955, Bernard Frankel's brother, George Frankel, is listed as one who has already contributed or pledged to contribute $5,000 to defray expenses of the Committee. This is repeated in the July 11, 1955 printed proof of the proposed proxy statement forwarded to the Commission on that date. However the name of George Frankel, as a pledger or contributor of $5,000, is omitted from the proxy statement of the Committee which was actually mailed to stockholders a few days later under date of July 13, 1955. This July 13 proxy statement did say that the members of the Committee had discussed their plans with Mr. Bernard Frankel, who was stated not to be a stockholder. But it is certainly a misleading understatement of the position which Mr. Bernard Frankel had assumed for some time to say of him and Mr. Walter W. Weismann "The relationship

of Committee members to the others (meaning Frankel and Weismann) has been confined to discussions of their common objectives, as stockholders, to improve the management and the earnings of Libby, McNeill & Libby".

The July 13 letter to stockholders, which accompanied the proxy statement of the same date, contains only this paragraph regarding Mr. Bernard Frankel:

"Mr. Bridges in his letter to stockholders of June 27, 1955 characterizes Mr. Bernard Frankel as the spearhead of the activities of the Independent Stockholders Committee. There can be no basis for such a characterization since Mr. Frankel is not a member of the Committee, is not a nominee for a position on the Board of Directors and seeks no office in the Company. Mr. Frankel is not the issue in this contest— he is not a stockholder although members of his family are substantial stockholders".

On all the evidence regarding Bernard Frankel's activity there is good reason to believe that the Committee intended to conceal the nature and extent of Frankel's activity and the fact that he was a leading factor in its activities so as to minimize the effect of the possible disclosure of his previous 1939 conviction for violation of the Securities Act. It is obviously in the public interest that the courts sustain the Commission in the full and complete enforcement of those regulations which require full disclosure regarding all those who are in fact members of such stockholders' committees and those for whom the solicitation of the proxies is being made in the broad and real sense.

Whether Bernard Frankel was technically a member of the Committee is a play on words. It is clear that he was at least as active and had as much to say as any of the other avowed Committee members. The studied failure to disclose his part in the activities and plans of the Committee was a deliberate and material violation of the Regulations

which properly require the proxy statement to set forth the names of the persons on whose behalf the solicitation is made. (Item 3-C of Schedule 14-A)

From Weismann's activities with the Committee, his ownership of over 18,000 shares, and his contribution of $5,000 to the expenses of the Committee, it is my opinion that he also should have been so listed as one on whose behalf proxies were solicited. He represented the group in discussions with the Company president in Chicago in June 1955, and seems to have been far more active than a mere member of a discussion group as the proxy statement would have the stockholders believe.

### 5. *Purpose of the Committee.*

The Commission has failed to make a sufficient showing that there is an intention on the part of the Committee to sell off the company's assets and liquidate its business should its nominees be elected. I credit the affidavit of Lawrence I. Becker regarding his talks with Bernard Frankel in which Frankel stated that he had plans to liquidate some of the company's business. This is not denied. But this is the only evidence from which any intention of the Committee may be spelled out. Even considering Bernard Frankel and Weismann to be members of the group soliciting proxies, (which I do, for the reasons set forth above,) it is merely evidence as to one of the members of the group. The fact that Walter W. Weismann may be considered in the business world as one who liquidates businesses is of little probative value. Weismann's affidavit, filed after the hearing was concluded, denies any such intention on his part. Therefore I find there was no violation of the Commission's regulation in failing to disclose such claimed intention. However, there can be no doubt that such intention, if it were the fact, would be very material in the sense that stockholders should be advised of it in a proxy statement, and that accordingly it would be within the power of the Commission to require such intention to be disclosed pursuant to its regulations.

### IV—Charges Against the Company

The Committee has charged the Company with violation of the Commission's proxy regulations particularly with reference to a letter to stockholders from Charles S. Bridges, president of Libby, dated June 28. The action now before this Court is one to enjoin unlawful practices by the Committee; the Company is before the Court only with respect to the holding of the annual meeting.

If it were clearly established that the opposition—here the Company—was guilty of publishing false and misleading information, this might provide a basis for finding that the material distributed by the Committee was justifiable, or that it would be inequitable to enjoin the Committee's activities while leaving the opposition free to continue its solicitation and to use the proxies so secured. It will suffice to say that no such showing has been made here. There is no evidence to show that the material submitted by the management went beyond the bounds of proper proxy solicitation. Although it does appear that Bridges' letter of June 27 was filed with the Commission only after it had been sent to the stockholders, the Commission has apparently found, in the course of its subsequent investigation pursuant to its order of July 21, that the material was permissible and that the failure to make timely submission did not warrant further action. Under these circumstances the Company's failure to make timely submission of one letter cannot be pleaded by the Committee in mitigation of its own offense.

### V—Relief Sought

The Commission charges that unless it is restrained the Committee will continue in the acts and practices complained of and will vote the proxies obtained as a result of its allegedly unlawful solicitation. The Commission further

**258**

complains that the Company unless enjoined will go forward with its annual meeting on August 17, 1955.

■ Since the individual defendants' course of conduct outlined above and their present contention that the proxy materials issued were not improper indicates that they are likely to continue the use of such materials unless restrained, injunctive relief is appropriate. There is no doubt of this Court's power to grant the relief requested by the Commission. 15 U.S.C.A. § 77t(b) gives the District Courts power to enjoin, pursuant to complaint by the Commission, acts or practices which constitute or will constitute a violation of the provisions of the Securities Exchange Act. Violations of Regulation X–14 are unlawful under 15 U.S.C.A. § 78n and are therefore enjoinable under this provision. The equity jurisdiction conferred by this statute embraces all power necessary to enforce effectively the provisions of the Securities Acts. Injunction against the use of unlawfully obtained proxies and postponement of a stockholders meeting long enough to correct the effects of the unlawful solicitation are within the competence of the Court in a proceeding of this kind. Securities and Exchange Comm. v. O'Hara Re-election Committee, D.C.D. Mass.1939, 28 F.Supp. 523; see Securities and Exchange Comm. v. Transamerica Corp., 3 Cir., 1947, 163 F.2d 511, 518, certiorari denied 1948, 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 418.

Accordingly, pending final determination of this matter, an injunction will issue, as the Commission prays, against the defendants Mitchell May, Jr., Alfred W. Parry, Jr., and Wilbur E. Dow, Jr., individually and as members of the Independent Stockholders Committee of Libby, McNeill & Libby and their agents, servants, employees and attorneys, restraining them from circulating the statements above referred to which I have found were communicated to stockholders in violation of the regulations of the Commission, and from soliciting proxies from the stockholders of Libby, McNeill & Libby by means of said statements, and from exercising any proxies already obtained as a result of such solicitation.

■ As the stockholders represented by the Committee's proxies will be disenfranchised if Libby's annual meeting takes place on schedule, a sufficient period of time should elapse before the meeting is held. This meeting now scheduled for August 17 at 10 A.M. in Portland, Maine must therefore be postponed for such period as will permit a proper resolicitation so that none of the 26,000 stockholders of Libby will be needlessly disenfranchised.

By a preliminary memorandum of opinion filed on August 13 I indicated my general conclusions in advance of filing this opinion and counsel were asked to submit proposed findings of fact, and conclusions of law and order of injunction for settlement on August 15.