UNION PACIFIC RAILROAD COMPANY et al., Plaintiffs,

v.

CHICAGO AND NORTH WESTERN RAILWAY COMPANY et al., Defendants.

No. 63 C 2051.

United States District Court
N. D. Illinois, E. D.
Feb. 18, 1964.

Stuart S. Ball, Walter J. Cummings, Jr., Henry A. Preston, Chicago, Ill., William C. Blind, William J. McDonald, Jr., New York City, Sidney, Austin, Burgess & Smith, Chicago, Ill., Clark, Carr & Ellis, New York City, of counsel, for plaintiffs.

Miles G. Seeley, J. Stanley Stroud, Arnold H. Lozowick, Frank D. Mayer, Jr., Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel, for defendant, Chicago & N. W. R. Co.

Samuel H. Young, William F. Coale, Jr., Lawrence A. Coles, Jr., Chicago, Ill., Hough, Young & Coale, Chicago, Ill., of counsel, for defendants, "Stockholders' Committee".

A. Leslie Hodson, Don H. Reuben, Louis J. Keating, Chicago, Ill., Lawrence Gunnels, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel, for defendant, Chicago, R. I. & P. R. Co.

JULIUS J. HOFFMAN, District Judge.

This action is the judicial culmination of a struggle between two of the nation's major railroads, the Union Pacific and the North Western, competing in their efforts to take over a third, the Rock Island. The contest in this phase concerns the efforts of these competitors to win the support of the Rock Island stockholders. Each has claimed a foul by the other in the solicitation of proxies for these stockholders' votes in a meeting scheduled for November 15, 1963, called for the purpose of approving a proposal for merger of the Rock Island with the Union Pacific.

The proceeding was commenced by the Union Pacific Railroad Company (Union Pacific), a Utah corporation with its principal place of business in Omaha, Nebraska, and by two individuals who jointly own 700 shares of the common stock of the Rock Island. The principal defendant is the Chicago and North Western Railway Company (North Western), a Wisconsin corporation with its principal place of business in Chicago. Jointly named as defendants are five individuals, citizens and residents of Illinois, who own stock of the Rock Island and are said to be members of the "Chicago, Rock Island & Pacific Railroad Company's Stockholders' Committee for North Western's Exchange Offer and Against Rock Island-U. P. Merger", hereafter referred to as the Committee. Two other members of this so-called Committee, not served with process, have been dismissed from the action. Because its interests are at stake in the controversy, the Chicago, Rock Island & Pacific Railroad Company (Rock Island), a Delaware corporation with its principal place of business in Chicago, has also been brought into the proceeding as a defendant.

The relief sought by the plaintiffs at this stage, as demanded in its motion for a preliminary injunction as amended and as altered in oral argument to the court, is an order in effect restraining the Rock Island from reconvening the meeting of its stockholders called for November 15, 1963, and requiring that a new meeting be called, with a new solicitation of proxies, to consider the proposed merger.

## I.

The background of the controversy has been developed at length in the evidence and briefs. A summary will suffice for the disposition of this motion. In the spring of 1963 the directors of the Rock Island had before them competing proposals for union with either the Union Pacific or the North Western. The Union Pacific offer contemplated a merger of the Rock Island into the Union Pacific, with Rock Island shareholders receiving 0.718 of a share of Union Pacific common stock for each share of Rock Island common. The North Western proposal, proceeding along different lines, took the form of an Exchange Offer to Rock Island stockholders through which the North Western sought to acquire control of the Rock Island and thereafter to effect a unification by merger or consolidation. The terms of this Exchange Offer tendered a so-called package to the Rock Island shareholders for each share of their common, consisting of (1) one thirty dollar ($30.00) principal amount North Western 6% Collateral Trust Income Bond, a new security to be issued to effect the acquisition; (2) 0.2778 of a share of North Western common stock; and (3) five dollars ($5.00) in cash. The offer was subject to approval by the Interstate Commerce Commission and conditioned on the offer by Rock Island stockholders of at least 51% of the Rock Island common stock outstanding, subject to a reservation by the North Western of the right to accept a lower percentage.

The directors of the Rock Island, agreeing with its management, concluded that the Union Pacific offer was preferable and accepted its proposal. A formal Plan of Agreement and Merger was thereupon approved by the boards of directors of both the Rock Island and the Union Pacific on June 27, 1963. The proposed merger required the approval of the ICC and of the stockholders of the two corporations. For the Rock Island, the applicable Delaware corporation law and its articles of incorporation required approval of the merger by the affirmative vote of two-thirds of its outstanding shares. On October 1, 1963, therefore, the Rock Island directors called a special meeting of the stockholders to be held on November 15, 1963, for the purpose of considering and taking action on the proposed merger. The call fixed October 4, 1963, as the record date for the determination of stockholders entitled to vote at the meeting. On that date nearly three million, precisely 2,916,711, shares of the Rock Island common stock

were outstanding and thereby entitled to vote at the scheduled meeting.

During the summer of 1963, before formal proxy solicitation began, a number of news stories were carried in the public press concerning the negotiations, the actions taken, and the offers made. Public announcements in the form of press releases were issued by the railroads, and the president of the North Western met with security analysts to explain the Exchange Offer. The North Western also made application to the ICC for approval of the plan embodied in its offer, and the Union Pacific and Rock Island petitioned in opposition. These actions occasioned further announcements and press releases. Since as a practical matter the Union Pacific plan of merger and the North Western offer to acquire the Rock Island shares were alternatives facing the Rock Island stockholders, these communications were susceptible to use as means to influence the Rock Island stockholders in their projected vote on the Union Pacific merger plan, even though they would not be called upon to vote directly on the North Western offer. An advertisement by the Union Pacific, published on July 26, 1963, in some forty-five metropolitan newspapers, prompted the staff of the Securities and Exchange Commission (SEC) to warn the Union Pacific that the advertisement constituted, in the staff's view, the solicitation of proxies subject to the SEC's regulations, and to admonish that such advertisements must comply with those regulations. The advertisement gave rise to a private suit, collateral to the action here, brought by a Rock Island stockholder seeking to require the Union Pacific to retract or correct the statements made. The United States Court of Appeals for the Seventh Circuit affirmed the dismissal of the suit by the District Court on the ground that the advertisement did not constitute a solicitation of proxies within the meaning of the applicable rules. Brown v. Chicago, Rock Island & Pacific Railroad Co., —— F.2d —— (7 Cir., 1964).

The counter proposals gave rise to another lawsuit during the summer of 1963 when, on July 17, eight shareholders of the Rock Island filed a petition for a writ of mandamus against their corporation in the Superior Court of Cook County, Illinois, demanding access to the corporate records of shareholders so that copies of the North Western Exchange Offer might be mailed to the Rock Island shareholders of record. The controversy was resolved by affording the plaintiffs the opportunity to mail the Exchange Offer to the shareholders contemporaneously with the first mailing by the Rock Island of proxy material for the scheduled meeting, and the plaintiffs were supplied with the Rock Island stockholder list.

After the disposition of that suit, counsel for the eight shareholder-plaintiffs wrote to them, advising that it might be desirable for them to oppose the proposed Union Pacific merger and in that event that they might form a committee, with the North Western requested to assume its expenses. Four of these eight responded by returning a form supplied with the letter, by which each "consented to the use of his name as a member of a Committee" to oppose the Union Pacific merger and authorized the attorney to act for the so-called Committee and to contact the North Western concerning financial support.

A week after his letter to the shareholders, the attorney wrote to the North Western, stating that the plaintiffs in the state court suit intended to form a committee to oppose the Union Pacific merger plan, and requesting that the North Western finance the reasonable expenses of the so-called Committee. The North Western replied on September 17, 1963, undertaking to "extend our financial assistance in the role of a participant in your proxy solicitation, subject to the applicable rules of the Securities and Exchange Commission." The North Western also agreed to indemnify the members against any liability that might result from the use of information or material supplied by the North Western.

Three other Rock Island stockholders were thereafter added to the so-called Committee through the recommendation and referral of the brokers for the remaining two shareholders who had been plaintiffs in the state court proceeding and are defendants here. Of the five so-called Committee members who are parties here, several had not even met the attorney until the midst of this trial. The so-called members had not met or deliberated or been consulted concerning their views, nor were they acquainted with the other couples or members of the Committee until during the course of this suit. There is no evidence that any of them has borne or will bear any expenses or costs with respect to any activities of the so-called Committee since its creation.

## II.

On October 1, 1963, formal proxy solicitation began with the mailing of proxy statements, forms, and supporting materials to Rock Island shareholders by both the Rock Island management and the so-called Committee, designating itself in full as the Chicago, Rock Island & Pacific Railroad Company's Stockholders' Committee for North Western's Exchange Offer and Against Rock Island-U. P. Merger. In the following six weeks a number of mailings were made by the Rock Island management to the Rock Island shareholders, seeking support for and approval of the plan of merger with the Union Pacific to be voted on at the meeting scheduled for November 15. In opposition, the so-called Committee and the North Western, acting in its own behalf, separately sent out a number of mailings to the Rock Island stockholders. All three railroads made use of their employees as proxy solicitors, telephoning or calling personally upon the shareholders and seeking their proxies.

Since the Rock Island stock is registered on the New York Stock Exchange, all solicitation activities were subject to the Securities Exchange Act of 1934 and to the regulations promulgated by the Securities and Exchange Commission under that authority. The staff of the SEC, in considering materials filed with it by the Committee and the North Western prior to distribution, made a number of comments, requests, and objections to the proposed materials. The North Western and the Committee acquiesced to some of these positions so taken by the SEC and made changes, deletions, or withdrawals. In other instances these defendants proceeded in spite of the staff positions. Objections and protests on behalf of the Union Pacific were repeatedly made to the SEC concerning the materials sent out by the so-called Committee and the North Western. Finally the Union Pacific requested that the Commission take judicial action to adjourn the scheduled meeting for a period of 60 days to permit resolicitation. The Commission replied on November 13 that it declined to take action as requested. On November 14, the following day and the very eve of the November 15 meeting, this action was filed.

On the basis of the complaint and the affidavit of its vice president and general counsel, the plaintiff Union Pacific moved immediately and *ex parte* for a temporary restraining order to prohibit the holding of the scheduled meeting. On the court's motion, notice was given to the defendants and they were heard, through their counsel, in arguments held the same day. An order was thereupon entered restraining the conduct of any business at the scheduled shareholders' meeting beyond an adjournment until such future date as might be fixed pursuant to subsequent order of the court, and in the interim restraining all parties from further solicitation of proxies or purchase of Rock Island common stock.

Hearings on the plaintiff's motion for a preliminary injunction began shortly and occupied more than two full weeks of trial. Since the temporary restraining order as entered was limited by its terms and by the Federal Rules of Civil Procedure to a period of ten days, the order was extended by stipulation of the parties until the determination of the motion for a preliminary injunction.

Full briefs and extensive proposed findings of fact and conclusions of law were submitted by all parties and two days were devoted to oral argument. With the filing of supplemental briefs and proposed findings, the matter was submitted for decision.

### III.

■ The controversy is governed by the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., enacted for the protection of the investing public in securities transactions. The Securities and Exchange Commission, generally charged with the administration and enforcement of this law, is specifically authorized to commence judicial proceedings for equitable relief against practices unlawful under the Act. Securities Exchange Act of 1934, Sec. 21(e), 15 U.S.C. § 78u(e). Despite doubts expressed in earlier decisions, there is today no serious dispute to question the proposition that the Act also authorizes suits brought by private persons, like the plaintiffs here, who claim injury from some violation of that law. See Borak v. J. I. Case Company, 317 F.2d 838 (7 Cir. 1963), cert. granted 375 U.S. 901, 84 S.Ct. 195, 11 L.Ed.2d 143 (Nov. 12, 1963); Dann v. Studebaker-Packard Corp., 288 F.2d 201 (6 Cir. 1961). Cf. Subin v. Goldsmith, 224 F.2d 753 (2 Cir. 1955), cert. denied 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779 (1955).

■ Although this suit departs from the usual pattern since the plaintiffs are neither the corporate management nor an insurgent group opposing management, the Union Pacific has standing sufficient to maintain this action to complain of the alleged violations. It is a joint owner of some 24,000 shares of Rock Island common stock and holds a proxy to vote that stock at the meeting in question. It is also a party to the provisional contract of merger which is to be approved or disapproved at the meeting. In either capacity, the Union Pacific has a genuine interest in assuring that the merger should not be defeated by prohibited conduct. Moreover, the presence in the case of the individual plaintiffs, joint owners of 700 shares of Rock Island common stock, furnishes an independent compliance with the requirement of standing.

■ The plaintiffs' standing is not prejudiced by the fact that the SEC declined to initiate judicial action to postpone the meeting when so requested by the Union Pacific. The proposition is little more than a corollary of the principle that the Securities Exchange Act of 1934 confers a private right of action. If private suits were barred in cases where the SEC chose not to sue, the private right would have an exceedingly limited utility. See Loss, The SEC Proxy Rules in the Courts, 73 Harvard Law Rev. 1041, at 1065 (1960). The practicalities of administration in a government agency forbid giving conclusive significance to SEC inaction. A lack of information or limitations of time, manpower, and resources will often dictate the decision not to sue. The fact that an interested and capable private party stands ready to commence judicial proceedings may itself diminish the need for public action.

■■ Different considerations come into play, however, when the agency has taken some affirmative action, although short of judicial proceedings. Here the staff of the SEC did in fact consider certain of the communications circulated by the Committee and the North Western, and made specific recommendations, comments, objections, and requests. The SEC is vested with primary responsibility for enforcing the Act and protecting the public interest. It makes the controlling rules. Where, as here, circumstances assure that agency consideration has been given to the merits of a question, the determinations and positions of the responsible authorities of the SEC carry significant weight and command deference in the courts. This distinction between viewing inaction as approval and deferring to specific and particular disapproval finds tacit recognition in the governing act of Congress. Section 26 of the Secu-

rities Exchange Act of 1934, 15 U.S.C. § 78z, provides:

"No action or failure to act by the Commission * * * shall be construed to mean that the particular authority has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein, nor shall such action or failure to act with regard to any statement or report filed with or examined by such authority pursuant to this chapter or rules and regulations thereunder, be deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading."

The substantive principles which control the issues presented here are to be found in the regulations made by the SEC. Congress has declared simply that: "It shall be unlawful for any person * * * to solicit or to permit the use of his name to solicit any proxy * * * in respect of any security * * * registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Securities Exchange Act of 1934, Sec. 14(a), 15 U.S.C. § 78n(a).

Pursuant to this power, the SEC has promulgated its Regulation 14 containing rules governing proxy solicitations. Basic to the regulatory plan is Rule 14a-6, which requires that preliminary copies of proxy soliciting material be filed with the Commission before such material is sent or given to security holders. This requirement affords the Commission staff an opportunity to examine materials in advance, in the interests of protecting the investing public. The standard against which soliciting materials are to be measured is set down by the SEC in its Rule 14a-9, which prescribes:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

Note: The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this rule:

(a) Predictions as to specific future market values, earnings, or dividends.

## IV.

The plaintiffs have charged a number of alleged violations of these rules by the Committee and the North Western during the period of proxy solicitation between October 1, 1963, and November 14, 1963. Prominent among the communications complained of is the so-called Hayden, Stone Report.

Hayden, Stone & Co., Incorporated, is a New York firm engaged as broker and dealer in the securities business, with branch offices and correspondents in other large cities. On October 4, 1963, the record date fixing eligibility to vote at the scheduled stockholders' meeting, the firm was record owner of 13,000 shares of Rock Island stock. On October 16, 1963, during the solicitation period, the firm released and distributed a four-page letter or pamphlet entitled "Progress Report: Union Pacific-Chicago North Western-Chicago, Rock Island & Pacific Railroad Merger Controversy." The Report was written by Pierre R. Bretey, an investment analyst in the firm who was described in the evidence as a dean of railroad analysts. The North Western management supplied information to Mr. Bretey

during the preparation of the Report, and two North Western officers consulted with him. A draft of the Report was submitted to the North Western for review before release, and a North Western officer made certain changes or suggestions of a minor nature.

Some 7,500 copies of the Report were printed. Approximately 5,000 of these were distributed to the regular customers of Hayden, Stone and its branch offices and correspondents. Most of the remainder were distributed to the North Western. Copies of the Report were furnished by some North Western proxy solicitors to Rock Island shareholders in the course of proxy solicitation. Other shareholders received copies of the Report in the mail from undisclosed sources. A number of copies came into the hands of broker-dealer firms who might be in a position to advise Rock Island stockholders concerning their votes, and of institutional investors such as banks, insurance companies, pension funds, and investment companies.

■ This Hayden, Stone Report was cast in the form of advice to Rock Island stockholders and concluded, in various phrasings, that the North Western offer was "far more attractive" than that of the Union Pacific. It thus constituted a communication to the stockholders "reasonably calculated to result in the procurement, withholding or revocation of a proxy" within the meaning of Rule 14a–1 of the SEC's regulations, and was thereby subject to the requirement of prior filing under Rule 14a–6, as the Commission staff determined when the Report came to its attention. At no time, however, was the Report filed with the SEC as required.

■ The North Western has candidly and repeatedly admitted in open court that the use of the Report constituted a violation of the SEC regulations and was therefore unlawful under the Securities Exchange Act of 1934. By way of exculpation, however, it is said that the offense of failure to file is merely a technical violation. The offense cannot be so easily dismissed. It deprives the Commission

of an opportunity to consider the solicitation material and thereby evades the first line of enforcement. A solicitor by failing to file circumvents the agency primarily responsible for protection of the investor and speculates upon the decision of the court. In any event, the violation committed here cannot be passed as mere technicality, since when the Report did in fact receive SEC consideration, the staff found it to be sufficiently objectionable to request that distribution cease. In response to this request, Hayden, Stone destroyed undistributed copies and called for the return of copies in the hands of its branches and correspondents. The North Western, also at the SEC's request, directed its proxy solicitors to make no further use of the Report and returned remaining copies.

Objections to the content of the Report concern principally the predictions, estimates, and opinions which it contains. There is no need to determine whether such statements would support a common law action for fraud or deceit. See Norris & Hirshberg v. Securities and Exchange Commission, 85 U.S.App.D.C. 268, 177 F.2d 228 (1949). The Congressional purpose was to elevate standards in the securities field above those generally prevailing. In applying the Commission's command that proxy solicitations be neither false nor misleading, the court is admonished to keep that goal in view. Since the Commission in its supervisory role is in constant touch with the problems of investor protection and aware of the needed safeguards, its findings and recommendations deserve weight and respect. The words to be interpreted here are the language of the SEC, exercising its power to prescribe standards, and the meaning of those words is illuminated by the intent revealed in their application by the SEC itself.

The Commission's Rule 14a–9 offers "predictions as to specific future market values, earnings, or dividends" as its first example of what may be false or misleading. There is good reason for this emphasis on prediction. Bald statements contrary to concrete and historic fact run

the risk of ready refutation and exposure, and to that degree are self-policing. Predictions, estimates, and opinions are more elusive and may present graver dangers of misleading the investing public. They lend themselves to this evil by allowing facts to be suggested or implied without direct statement. Even if they do not tend to induce belief in any particular fact, they nonetheless import the existence of unspecified facts which support the conclusion. The shareholder may be led readily to assume, contrary to fact, that the predictor has special knowledge or unique information to bear out fully his prediction, and be induced to rely upon a supposed expert judgment of the mysteries of finance. "Since an expert can speak with authority only as to subjects upon which he has professional knowledge and since no engineering course or other professional training has ever been known to qualify anyone as a clairvoyant, attempts by companies to predict future earnings on their own or on the authority of experts have almost invariably been held by the Commission to be misleading because they suggest to the investor a competence and authority which in fact does not exist." Heller, Disclosure Requirements Under Federal Securities Regulation, XVI The Business Lawyer 300, 307 (1961). Whether the prediction is the product of an intent to mislead or of innocent overenthusiasm, the misleading effect upon the investing public is the same.

The Hayden, Stone Report, used for proxy solicitation, plainly offended against these principles. It advises that there should be added to the past earnings record of the North Western "merger savings of twenty-five million dollars which are anticipated when Rock Island and North Western actually merge." The dollar figure so stated was not arrived at by disinterested study but adopted from the prediction of North Western's management. The SEC staff had objected to the use of the figure as proposed for inclusion in materials prepared by the North Western, where it was more guardedly described as an estimate, which could not be guaranteed, indicated by North Western management studies. In considering the North Western filing, the staff had also objected to any assumptions of a North Western-Rock Island merger, since its realization was remote, contingent, and conjectural. The Hayden, Stone Report went further, however, and predicted "potential savings" of seventy-five million dollars from an assumed three-way merger in which the Milwaukee Road would be added to the North Western and Rock Island.

In the same vein, the Report presented specific earnings for a merged North Western-Rock Island on the basis of an appended pro forma tabulation of a kind which had been deleted from North Western's proxy solicitation materials as the result of discussions with the SEC. An additional prediction of specific earnings was offered for the assumed three-way merger including the Milwaukee. Combining a prediction of the trend in the market price of the bond to be offered in exchange by the North Western and a prediction of the future value of North Western stock, the Report predicted that "work out values" of the package offered by the North Western "should reach well above forty dollars per share" as compared with a value "between twenty-eight dollars and twenty-nine dollars per share on the Union Pacific exchange offer." As an additional reason for preferring the North Western offer, the Report predicted: "In our judgment, the [Interstate Commerce] Commission is not likely to approve the Union Pacific's acquisition of the Rock Island since such acquisition would doubtless seriously injure the North Western and Milwaukee Systems." The SEC staff had recommended the deletion of a similar prediction from the solicitation materials filed by the North Western because of "its extremely speculative nature and possibly misleading effects."

The court is constrained to agree with the judgment of the SEC staff that such predictions mislead by conveying a certitude which inherently they cannot possess. Viewed as a whole, the Hayden,

Stone Report was misleading in the circumstances of its use. Whatever its value for other purposes, it was inappropriate for use in proxy solicitation under the demanding standards of conduct established in the public interest for all sides in such a contest. In the light of this finding, it is unnecessary to decide whether the somewhat similar predictions contained in the materials of the North Western and of the so-called Committee also crossed the line of propriety.

## V.

■ In their defense, the North Western and the Committee point to a number of allegedly misleading statements made on behalf of the Union Pacific merger in the newspaper advertisement of July 26, 1963, and in other communications, oral and written. Because the plaintiff Union Pacific is thus also guilty of wrongdoing, it is claimed, it should be denied equitable relief regardless of the defendants' violations. The argument is premised on the principle that "He who comes into Equity must come with clean hands." This requirement, characterized by the late Professor Zechariah Chafee as the most amusing maxim of equity, derives from the unwillingness of a court of equity, as a court of conscience, to lend the aid of its extraordinary powers to a plaintiff who himself is guilty of reprehensible conduct in the controversy and thereby to endorse such behavior. See Chafee, Some Problems of Equity 1 (1950); Art Metal Works, Inc. v. Abraham & Straus, Inc., 70 F.2d 641, 646 (2 Cir. 1934) (Judge Learned Hand dissenting), cert. denied 293 U.S. 596, 55 S.Ct. 110, 79 L.Ed. 689 (1935). In the application of the maxim, the courts act for their own protection in obedience to the demands of public policy and with a wide range of discretion. See Gaudiosi v. Mellon, 269 F.2d 873, 881 (3 Cir. 1959); Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

■ ■ To apply the maxim in this case would produce the illogic of leaving the shareholders unprotected when they have been doubly misled, stultifying the underlying purpose of the national securities laws. Where a public interest is at stake, above the interests of the parties themselves, the protection of that paramount interest overcomes the judicial reluctance to assist a wrongdoer. See Shinsaku Nagano v. McGrath, 187 F.2d 753 (7 Cir. 1951). In A. C. Frost & Co. v. Coeur d'Alene Mines Corp., 312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500 (1941), the plaintiff's suit for delivery of shares purchased from the defendant corporation was resisted on the ground that the shares were unregistered, so that the plaintiff had himself violated the law in contracting to buy them. The Supreme Court rejected the defense. "Here the clear legislative purpose was protection of innocent purchasers of securities," the Court observed. To deny relief because of the illegality of the contract would "seriously hinder rather than aid the real purpose of the statute." (312 U.S., at 43, 61 S.Ct. at 417, 85 L.Ed. 500.) Declaring the general principle, the Court stated:

> "Courts have often added a sanction to those prescribed for an offense created by statute where the circumstances fairly indicated that this would further the essential purpose of the enactment; but we think where the contrary definitely appears —actual hindrance indeed of that purpose—no such addition is permissible. The latter situation is beyond the reason which supports the doctrine now relied on." (312 U.S., at 43, 61 S.Ct. at 417, 85 L.Ed. 500.)

■ The principle so declared is not inapposite by reason of the fact that the action was at law and not in equity. The clean hands maxim is not peculiar to equity, but expresses a general principle equally applicable to damage actions. Chafee, Some Problems of Equity 94 (1950).

The decisions principally relied upon by the defendants presented situations where the court was called upon to aid the plaintiff in the promotion or fulfillment of

an illegal or unconscionable scheme. In Precision Instrument Maufacturing Corp. v. Automotive Maintenance Machinery Corp., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), the plaintiff sought protection for a patent procured by perjury. In Gaudiosi v. Mellon, 269 F.2d 873 (3 Cir. 1959), the plaintiff had violated the proxy rules in furtherance of his candidacy for director. No such circumstances are present here. The Rock Island has taken the position that all proxies on both sides must be cancelled, and the Union Pacific has acceded to that position in view of the practicalities of the remedy. To grant such relief would deprive the plaintiff of any benefit from its supposed wrongdoing and would wipe the slate clean for a new solicitation of all proxies. If both sides are guilty of misleading the Rock Island stockholders, public policy and the legislative purpose are surely better served by a fresh vote than by a refusal to act out of repugnance to unclean hands.

Moreover, most of the ground for this defense is under cut by the decision of the Court of Appeals in the companion case, holding that the advertisement of July 26, 1963 did not violate the proxy solicitation rules. Brown v. Chicago, Rock Island & Pacific Railroad Co., 328 F.2d 122 (7 Cir. 1964). In any event, however, there is no suggestion that the individual plaintiffs are in any way chargeable with wrongdoing to bar relief for protection of their independent interests.

 It cannot be said with indisputable certainty that the use of the Hayden, Stone Report necessarily defeated an otherwise favorable vote on the Union Pacific merger. A tabulation of management proxies which had been received by 8:00 A.M. on November 15, 1963, the day of the scheduled meeting, reveals that slightly less than one-half of the outstanding shares had been voted for the merger, while a vote of two-thirds of the total was required for approval. Abstention under this requirement was the equivalent of a negative vote. Although 76% of the shares held in the names of individual owners had been voted in favor of the merger, only 19% of the shares held in the names of brokers and 23% of the shares held in the names of nominees had been voted for the merger. Since roughly 50% of the outstanding stock was held in the names of brokers and nominees, and since the Report was circulated principally to those groups, it is reasonable to infer that the Report actually affected the result.

To require direct proof that the votes of a critical number of shares were changed by the Hayden, Stone Report, and more precisely by its misleading portions, would raise insuperable obstacles to relief and nullify the legislative purpose. The present state of understanding of human mental processes does not enable us to weigh with exactitude the components of decision or to determine scientifically that any particular element was controlling. The law does not ask more than human knowledge can supply. The substantial probability of a different result if improper evidence had not been submitted suffices to set aside the vote of a jury. The same standard applies in reason to the stockholders' vote. Once it is established that the processes were tainted by misleading statements, a substantial probability that the statements were dispositive is enough to warrant relief.

### VI.

Contributing to the misleading effect of the proxy campaign was the role of the self-styled Chicago, Rock Island & Pacific Railroad Company's Stockholders' Committee for North Western's Exchange Offer and Against Rock Island-U. P. Merger, the so-called Committee. Its title conveys the impression of a group of shareholders, representing the interests of all, acting independently upon their own considered conclusions. In fact the so-called Committee consisted of some seven shareholders representing an aggregate of 950 of the nearly three million shares of Rock Island stock held by more than 11,000 owners. Some 500 of these shares had been purchased after the Union Pacific-North Western controversy arose. In fact these persons simply lent their names

to the campaign at the suggestion of a broker who contacted the attorney for them. In fact they did not meet or deliberate or contribute their views or opinions, to each other or their attorney. In fact they furnished no financial support for any of the activities of the Committee and assumed no obligations. In any ordinary or meaningful sense of the term, there was in fact no committee.

Still the major portion of the proxy campaign was carried on in the Committee's name. The proxy forms distributed bore its title. The illusion of substantial, separate, and impartial support for the North Western offer was heightened by the repetition, in proxy solicitation materials, of such phrases as "The Committee has made a study * * *," "The Committee is of the opinion * * *," "the Committee believes * * *," and "the Committee has considered. * * *" The impression thus created was not dispelled by the disclosures, in the Committee proxy statement, that "The North Western has agreed to pay a substantial amount, if not all, of the expenses of the Committee except expenses of members of the Committee incurred prior to September 16, 1963, which expenses aggregated approximately $5,000.00." In fact the so-called members consented to the use of their names as a "Committee" only upon condition that the North Western assume all expenses. The technique of employing an ostensibly independent organization to gain public support has been judicially recognized as deceptive. In United States v. New York Great A. & P. Tea Co., 67 F.Supp. 626 (E.D.Ill.1946), affirmed 173 F.2d 79 (7 Cir. 1949), the late Judge Lindley said, "Though it was stated openly that A & P was contributing to the cost, it was never revealed to the public that it was the sole responsible party back of the organization. * * * Suffice it to say, the organization was in effect the creation of defendants and the public could not have been and was not aware of the full extent of their sponsorship or of A & P's responsibility for its existence." (67 F.Supp., at 673–674.) See also Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 140, 145, 81 S.Ct. 523, 5 L.Ed. 2d 464 (1960).

 The fact that the so-called Committee was merely a paper organization, whose professed members neither expended effort nor incurred burdens, did not emerge until the trial. The plaintiffs are not therefore barred by laches or estoppel because they failed to object at an earlier stage to solicitation in the Committee's name. Nor is it a defense that this third-party technique may have become a common manipulative device in modern mass persuasion. The beneficial requirement of meticulous disclosure demanded by the federal securities laws cannot be evaded by measurement against the lowest common moral denominator in communications. As Mr. Justice Goldberg recently explained, "A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry. As we recently said in a related context, 'It requires but little appreciation * * of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry." Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186–187, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963).

## VII.

Violation having been established, the remaining issues concern the propriety and scope of relief. Since the Rock Island here takes the position that the scheduled meeting, now suspended by adjournment pursuant to the temporary restraining order, should be cancelled, and since the Rock Island directors called that meeting in the first place, it is said that a decree of cancellation would merely declare what the directors have power to do in any event. It does not follow, however, that management, having power to call a stockholders' meeting, may cancel it simply because the proxies returned in-

dicate an unfavorable vote. Substantial expenditures in the proxy solicitation may raise an estoppel in the absence of good cause. If, however, misleading information has been circulated among the stockholders, preventing an intelligent and untainted decision, cancellation may be justified as a reasoable exercise of managerial discretion without regard to whether the circulation was made by the opponent in the proxy contest or by some unrelated third person. Neither the corporate interest nor the public interest is satisfied by the votes of misled stockholders simply because the misinformation was not distributed by either party. This point is emphasized in an opinion of the General Counsel of the SEC, released by the Commission on January 7, 1964 (Number 34–7208), which warns that the distribution of unsolicited advice by a broker or dealer concerning how stockholders should vote may constitute unlawful proxy solicitation.

There is no need to decide here whether cancellation of the meeting would be warranted on these grounds if the Hayden, Stone Report had been independently circulated by that firm without the participation or concurrence of the North Western or the Committee. Here the North Western shared in the preparation of the Report and in its distribution. It is also unnecessary to decide at this stage whether the North Western and the so-called Committee are equally and jointly culpable in the distribution of misleading information, since the equitable relief of cancellation is necessarily unitary.

Such relief should be denied, it is said, because the plaintiffs would suffer no irreparable injury if the meeting were held and the votes counted. If the merger were defeated, the argument proceeds, the result could be set aside upon further hearing. In response, the plaintiffs assert that there is substantial doubt concerning the power of the court to set aside a vote after it is held. In Dann v. Studebaker-Packard Corp., 288 F.2d 201 (6 Cir. 1961), it was held that federal jurisdiction under the Securities Exchange Act of 1934 extends to the determination only of the validity of proxies and not of the consequences of invalidity. The plaintiffs' reliance here upon diversity as an additional ground of jurisdiction will not serve to distinguish that decision if the court is obliged to re-align the Rock Island as a plaintiff in view of its community of interest with the Union Pacific. See City of Indianapolis v. Chase National Bank, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47 (1941). Such a re-alignment would destroy the required complete diversity if, as alleged, Illinois is the principal place of business of the Rock Island. United States Judicial Code, Sec. 1332(c), 28 U.S.C. § 1332(c) (1958). The Court of Appeals for this Circuit has disagreed with the Dann decision, and the United States Supreme Court on November 12, 1963, granted certiorari to resolve the conflict. Borak v. J. I. Case Company, 317 F.2d 838 (7 Cir. 1963), cert. granted 375 U.S. 901, 84 S.Ct. 195, 11 L.Ed.2d 143 (1963), pending, U.S. Supreme Court Summary Docket No. 402.

However that controversy may be resolved, there is no reason to delay judicial action until after the meeting. By initiating this very proceeding, the plaintiffs have asserted that their merger would be defeated. To confirm this result and then set it aside would gain nothing. To hold the meeting would entail effort and expense. For the North Western, no vote at all is in a sense as good as a negative vote. The record date established to determine eligibility to vote at the scheduled meeting was October 4, 1963. Since many shares have been traded in the months intervening since that date, to proceed with the meeting would disenfranchise a number of stockholders who have a real and current interest in the outcome.

██ There can be no doubt that the Union Pacific would suffer irreparable injury if the proposed merger were finally defeated by reason of unlawful proxy solicitation. The court has decided, upon the evidence submitted, that unlawful solicitation has been proved. There is no reason why that decision should not be final. The parties have been afforded a

full opportunity to make their cases on the issue. Plaintiffs concede that they could offer nothing more of substance, and the North Western suggests only that it would pursue discovery for more evidence on the matter of unclean hands, a defense which the court finds insufficient in these circumstances even if factually established. Therefore no need to postpone decisive action appears, even though the plaintiffs have described their demand for an injunction as preliminary. There is ample authority for the cancellation of a stockholders' meeting and the invalidation of proxies upon a motion for a preliminary injunction. See Securities and Exchange Commission v. O'Hara Re-election (or Proxy) Committee, 28 F. Supp. 523 (D.Mass.1939); Securities and Exchange Commission v. May, 134 F. Supp. 247 (S.D.N.Y.1955), affirmed, 229 F.2d 123, 55 A.L.R.2d 1123 (2 Cir. 1956); Willoughby v. Port, 182 F.Supp. 496 (S.D. N.Y.1960), modified and affirmed 277 F.2d 149 (2 Cir. 1960); Securities and Exchange Commission v. Transamerica Corp., 67 F.Supp. 326 (D.Del.1946), modified and affirmed 163 F.2d 511 (3 Cir. 1947); Securities and Exchange Commission v. Okin, 58 F.Supp. 20 (S.D.N.Y. 1944).

In view of these conclusions, the claim of conspiracy set forth in Count II of the complaint need not be separately considered.

Accordingly, an order will be entered enjoining the holding of a meeting of the Rock Island shareholders to vote on the proposed merger into the Union Pacific until such date, not earlier than 60 days from the date of the order, as may be fixed and announced by the Rock Island directors. The record date for determining eligibility of shareholders to vote at the meeting shall be fixed by the Rock Island directors as well. The parties will be enjoined from voting at this meeting any proxy received on or before the date of the order. Solicitation of proxies for the new meeting shall be conducted in accordance with the applicable regulations of the SEC. In view of these restrictions the plaintiffs' demand for a mandatory injunction directing that the so-called Committee be disbanded is denied. The order having been entered, the temporary restraining order will be dissolved.

These findings and conclusions constitute the court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.